**GULF INSURANCE COMPANY, a corporation, Plaintiff,**

v.

**GOLD CROSS AMBULANCE SERVICE COMPANY, a corporation, and Irene Ward, Defendants.**

**Civ. No. 70–359.**

United States District Court, W. D. Oklahoma.

May 28, 1971.

James W. Shepherd and George W. Dahnke of Foliart, Shepherd, Mills & Niemeyer, Oklahoma City, Okl., for plaintiff.

Richard Morris of Fulkerson & Morris, Oklahoma City, Okl., for defendant Gold Cross Ambulance Service.

Ed Abel of Lampkin & Wolfe, Oklahoma City, Okl., for defendant Irene Ward.

## MEMORANDUM OPINION

EUBANKS, District Judge.

This is an action for a declaratory judgment, pursuant to 28 U.S.C. § 2201, brought by Gulf Insurance Company, a corporation organized and having its principal place of business outside of the State of Oklahoma [hereinafter called "Gulf"] against Gold Cross Ambulance Service, Inc., a corporation organized and existing under the laws of the State of Oklahoma [hereinafter called "Gold Cross"], and Irene Ward, a citizen of Oklahoma. This Court has jurisdiction of this cause by virtue of diversity of citizenship, 28 U.S.C. § 1332, the requisite diversity and amount in controversy having been found to exist.

Gulf seeks a declaratory judgment by this Court that a certain insurance policy, No. GA 5 39 88 05, commonly known as a General-Automobile Liability Policy, issued by Gulf to Gold Cross and in full force and effect on May 11, 1970, does not obligate Gulf to appear for or defend Gold Cross in a pending state action or any other suit therein seeking damages on account of alleged injury to or death of one Elvis Ward, deceased, nor to pay any judgment which may be rendered against Gold Cross in any such suit.

The action in the state court, styled, Irene Ward, wife and next surviving kin of Elvis Ward, deceased, vs. Gold Cross Ambulance Service, Inc., No. CJ–70–1869 in the District Court in and for Oklahoma County, Oklahoma, grows out of an occurrence of May 11, 1969, on which date Elvis Ward, deceased, husband of Irene Ward, became ill and died. The plaintiff alleges in her petition therein, that on said date, pursuant to her request, an ambulance owned by Gold Cross and driven by its employees arrived at her home but that said employees refused to transport her husband to the hospital and negligently caused his death in that they knew or should have known that plaintiff's husband was in acute distress and that any delay in transporting him to the hospital would likely cause his condition to deteriorate or cause his death, for which acts of alleged negligence plaintiff seeks to recover damages.

The insurance policy, respecting which Gulf seeks a declaratory judgment, contains an "Exclusion" sub-styled "Malpractice and Professional Services", which provides that the policy does not cover bodily injury due to rendering of or failure to render any service of a professional nature. Gulf contends that the circumstances giving rise to the suit in the state court fall within the "Exclusion". The interpretation of an insurance policy, like any other contract, is a question for the court. Western Casualty & Surety Co. v. Pacific Employers Ins. Co., D.C.Okl., 1951, 97 F.Supp. 956. The coverage of such a policy, absent a statutory mandate, is governed by the terms and conditions of the insurance contract. Freedom of contract is the general rule. The parties may delineate coverage or noncoverage as they see fit subject only to limitations prescribed by public policy. In Fidelity and Casualty Company of New York v. Reece, CA 10, 1955, 223 F.2d 114, Judge Murrah said:

> Parties may contract to extend or limit insurance liability risks as they see fit, and the issue to be determined here—the scope of liability insurance

—is determined from the contractual intent and objectives of the parties as expressed in the policy and its endorsement. [Citations omitted] Doubtful or ambiguous provisions defining or limiting the scope of the risk must weigh against the insurer. [Citations omitted] But the extent or limits of the risks, if unambiguous, must be accepted in their plain, ordinary and popular sense, and liabilities clearly not contemplated under a fair and reasonable interpretation of the contract with its omnibus provisions may not be imposed upon the contracting parties. [Citations omitted]

The court now turns to consideration of the meaning of the language used in the "Exclusion". The policy contains a section dealing with the definition of words and phrases used, e. g. "automobile", "bodily injury", etc. It does not, however, define the phrase "service of a professional nature" which appears in the "Exclusion". The meaning is to be found in the context in which the phrase appears. The exclusion relied on by Gulf is one among many covering injuries to property as well as bodily injuries, of which all are headed, in bold-faced capital letters as "EXCLUSION". "Exclusion" is singular, not plural, in number. Immediately beneath the bold-faced capital-lettered caption styled "EXCLUSION", bracketed in smaller black letters, appears the phrase "Malpractice and Professional Services". "Malpractice" appears first. It is singular in form. "Professional services" appears second and in plural form.

The "Exclusion" is lengthy but is stated in a single sentence of 102 words. It recites the effective date, the policy number, the names of the insured and insurer, and thereafter reads as follows:

It is agreed with respect to any operation described above or designated in the policy as subject to this endorsement, the insurance does not apply to bodily injury or property damage due to

1. the rendering of or failure to render

(a) medical, surgical, dental, x-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith;

(b) any service or treatment conducive to health or of a professional nature; or

(c) any cosmetic or tonsorial service or treatment;

2. the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or

3. the handling of or performing of autopsies on dead bodies.

The EXCLUSION recites an agreement respecting operations described or designated in the policy to which "the insurance does not apply." As to such operations the policy does not cover either bodily injury or property damage. The function word "or" is repeated 16 times in the exclusionary sentence. The result is that there are 116 possible operations of the insured to which "the insurance does not apply." Respecting liability for bodily injury, numerical section 1[b] contains eight exclusions of which two are "the rendering of or failure to render * * * any service * * * of a professional nature." The basic contention of Gulf is that Gold Cross, on May 11, 1970, in doing the acts complained of in the state case, was engaged in rendering "service of a professional nature." Gulf contends that, on May 11, 1970, the operation of an ambulance service by Gold Cross, "for the purpose of delivering ill and disabled persons for hospital treatment is a 'service conducive to health or of a professional nature'" and that numerical part 1[b] of the EXCLUSION is applicable.

It is not without significance that the bracketed subtitle "Malpractice and Professional Services" is printed immediately beneath "Exclusion". "Malpractice" appears first in the sub-title. "Malpractice" is the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent member

of the profession with the result of injury to the recipient of those services. Webster's Third New International Dictionary of the English Language, unabridged, 1966. It was originally applied only to physicians but is now applied to all professions and even to non-professionals who have special skills.

Sub-section 1[a] of the exclusionary endorsement does not limit "malpractice" to physicians but includes as well "medical, surgical, dental, x-ray or nursing services." In reading the enumeration one thinks in terms of help to somebody hurt or sick or being treated. The reader thinks of a liability hazard of the same kind as suggested by the malpractice of physicians. In that context, the phrase in 1[b] "any service or treatment conducive to health or of a professional nature" leads the reader along the same channel of thought, i. e. of somebody being treated for hurts or sickness. In short, in reading 1[a] and 1[b] one thinks of injuries, attendant service or treatment in the healing arts. The EXCLUSION was written by experienced draftsmen. If it was their intent to equate "ambulance service" and "professional service" they could have included "ambulance service" in numerical part 1[a] immediately following the listing of "nursing service." That is the place in the sequence at which it would appear properly to belong if exclusion had been intended.

Ambulance "service" generally is not professional in nature. In cases where ambulance attendants administer oxygen or administer hypodermics the acts may be professional service although the attendants may not be professional men. The word "service" connotes work. Not all work is professional. "Professional service" traditionally, and as generally understood, means work requiring knowledge of an advanced type in a field of learning or science customarily acquired by a prolonged course of study of specialized intellectual instruction as distinguished from training in the performance of routine, manual, or physical processes.

"Professional service" is said to be predominantly intellectual in character as opposed to physical. The courts have so held. In Marx v. Hartford Accident and Indemnity Co., 1968, 183 Neb. 12, 157 N.W.2d 870, in holding that an employee technician was not, in refilling a hot water sterilizer, "rendering or failure to render professional services", the court said:

A professional act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

Whether particular work is of a professional nature is determined by the work in question and not by the title of the worker. "Medical treatment" in the form of home remedies, or the giving of a hypodermic injection, without consultation with or attendance by a physician, may be administered by a parent, a nonprofessional, to his sick child. If so, it would be work or service "of a professional nature." Mason v. Liberty Mutual Insurance Company, CA 5, 1967, 370 F. 2d 925.

Three reported cases involved exclusionary endorsements identical with the case at bar. In each, the court looked to the nature of the act being performed rather than to the title of the actor involved. In a case which involved a factual situation which most nearly parallels the case at bar, D'Antoni v. Sara Mayo Hospital, La.App.1962, 144 So.2d 643, the court held that failure of hospital employees to maintain the side rails on a patient's bed in proper position was not "failure to render any service or treatment conducive to health or of professional nature". The cited case involved a malpractice exclusionary clause in a hospital comprehensive general liability insurance. Therein the court said:

It seems to us that in determining whether or not a particular act or failure to act is of a professional nature we should look not to the title or the character of the party performing the

act but to the act itself. The raising of the side rail was purely a mechanical act which any unskilled person could perform. It certainly requires no professional training or knowledge. The side rails were not a part of the patient's treatment per se since she could have recovered without them. They were simply a safeguard to provide her with a safe place to stay and were not a "service or treatment conducive to health" any more than a safe floor to walk on would be. Neither was the maintaining of the rails a nursing service since the placing of the rails could be performed by anyone without the slightest nurses' training. While the initial decision to attach the side rails to the bed may have involved professional judgment, once the attending physician issued the order the professional aspect of it was complete. The placing and maintaining the rails in position was purely mechanical.

The exclusionary endorsement involved in Tankersley v. Insurance Company of North America, La.App.1968, 216 So.2d 333, was identical with the one in the case at bar. The court there also looked to the nature of the service and held that the acts of nurses complained of fell squarely within the malpractice and professional service exclusion of a liability insurance policy. In so holding the court said:

> In order to determine the applicability of the endorsement of this policy it is appropriate to look to the nature of the service which plaintiff here complains was not performed * * * nurses are classed as professional persons employed to exercise their calling on their own responsibility * * * nurses are grouped with physicians and surgeons and not with chambermaids and cooks * * * if these nurses in this case determined not to call the physician they acted in their professional capacity and on their own responsibility as employees of the defendant hospital. We do not consider the mere act of using the telephone to call the doctor as determinative of the issue, because using the telephone is only a manual and mechanical operation. We must assume that the nurses exercised their expert judgment in deciding whether or not to make the call. That decision on the part of the nurses was the failure to render a nursing service and falls squarely within the provision of the exclusion of the insurance policy in this case.

Likewise in Keepes v. Doctors Convalescent Center, Inc., 1967, 89 Ill.App. 2d 36, 231 N.E.2d 274, the exclusionary endorsement was identical with one in the case at bar. The court looked to the act complained of. The insured cared for retarded children and employed doctors and nurses for that purpose. The court held the insured's liability for injuries sustained by an 18-month-old mentally retarded child was not within the exclusionary endorsement where the child, being prepared for a bath by a maid who had laid the child on a sheet on the floor and had gone from the room to prepare his bath, when he came into contact with a hot radiator. The court said:

> The facts show this was an injury caused by negligence. It was connected with normal living—the child was being prepared for a bath and the child was in what was then his home. While Susie McDonaly [the attendant] was called a nurses' aide, she was working as a maid. While the occurrence took place in the Doctors Convalescent Center, aside from the negligence which caused the injury, nothing was being done with the infant which would not be done in an ordinary home.

The decision in American Policyholders Ins. Co. v. Michota, 1952, 156 Ohio St. 578, 103 N.E.2d 817, involved a Professional Liability Policy. The insurance carrier therein sought a declaratory judgment as to its obligation to defend a certain action brought against its insured, a chiropodist, by one of his patients. The factual situation was that a patient was told by the insured to sit

in a certain treatment chair which rotated in a manner similar to a barber chair. As the patron was getting into the chair it rotated and she lost her balance and fell to the floor whereby she sustained certain injuries. In her suit against the chiropodist she alleged that he was negligent in failing to lock the chair, in failing to warn her of its dangerous condition and in failing to maintain the chair in a safe condition for her use as a patient. The court held that the insurer was obligated by its policy to defend the suit on behalf of the chiropodist and said:

> Maintaining the treatment chair in a proper and safe condition for the accommodation of patients was a service or duty directly connected with the practice of his profession as a chiropodist, chiropody being a limited branch of medicine or surgery.

The holding in Knorr v. Commercial Casualty Insurance Company, 1952, 171 Pa.Super. 488, 90 A.2d 387, is distinguishable on the facts. The exclusionary endorsement was to an Owners'-Landlords'-Tenants' liability policy. The proof was that an agent of the insurer, at the time the endorsed policy was delivered had indicated to the insured that the policy would not cover an injury of the type sustained by the suitor.

Gulf relies herein on Ocean Accident and Guarantee Corporation v. Herzberg's, Inc., CA 8, 1938, 100 F.2d 171, cert. den., 306 U.S. 645, 59 S.Ct. 584, 83 L.Ed. 1044, where the appellate court reversed the trial court. It involved an action arising when a customer of insured recovered damages for personal injuries caused by an electrical treatment administered by a cosmetician in a beauty shop operated in the insured's store. The court held that a public liability policy issued by the insurer did not cover the risk since the policy contained an endorsement providing that the insurer was not liable for injuries sustained "in consequence of professional services".

In holding that the cosmetician was performing "professional service" which fell within the exclusionary endorsement of the policy, the appellate court reversed the trial court. In so doing it defined the word "profession" to mean "the occupation which one professes to be skilled in and to follow, and involves the vocation in which a professed knowledge of some department of learning or science is used in application to the affairs of others or in the practice of an art founded upon it." We do not find that the definition has been followed by any court since it was promulgated almost forty years ago.

The reversal was by a divided court. Circuit Judge Woodrough, in a better-reasoned dissenting opinion after noting the numerous departments operated by the assured and the skilled work required of the employees in each department, said:

> Undoubtedly there is a sense in which every trained and skilled worker on the crowded premises was engaged in practicing a profession * * * The skilled man or woman who fitted shoes comfortably on tender feet, those who could make the buyers of the garments look as they wanted to look, and those who succeeded in the beauty shop, were not amateurs * * * They were all rendering professional services or treatments within the extraordinary definitions discoverable in dictionaries.

The definition of the word "profession" which was fashioned by the majority of the court in Ocean Accident, etc., supra, fails to distinguish between "professional service" and "skilled manual labor". The work of a licensed chauffeur in the operation of an automobile is not made "professional service", comparable to the physician's treatment of a patient or the cleric's ministrations to his parishioners, by simply designating it to be such. Ambulance service is primarily manual. It is generally regarded as such. While it may require skill on the part of those who render the service, it does not require knowledge of an advanced type in a field of learn-

ing customarily acquired after a long period of specialized intellectual instruction.

The definition of professional service adopted by the court in *Ocean, etc.,* supra, emphasized the qualifying adjective "professional" and de-emphasized the noun "service" in the phrase "professional service". In other words, the attention is centered on the actor involved in rendering service rather than on the act of service involved. Compare, New Amsterdam Casualty Co. v. Knowles, Fla., 1957, 95 So.2d 413.

Neither the briefs of counsel nor the research of the court has disclosed a reported case wherein the definition in *Ocean, etc.,* supra, has been adopted by any court except possibly in 1950 by implication in the majority Memorandum Opinion of the Appellate Division of the Supreme Court of New York in Ruggieri v. New Amsterdam Casualty Company, 276 App.Div. 1031, 95 N.Y.S.2d 832, 834. The definition has not been found to be acceptable to other courts. It is not acceptable here even though the court is aware that Herzberg's, Inc. was unsuccessful, in a later action, to reform the insurance policy involved. Herzberg's Inc. v. Ocean Accident and Guarantee Corp., D.C.Neb., 1941, 42 F.Supp. 52, aff'd CA 8, 1943, 132 F.2d 438.

For the reasons aforestated the court is of the opinion and holds that Gold Cross Ambulance Service, Inc., on May 11, 1970, responding to a call of Irene Ward for ambulance service, and in refusing to transport her husband to the hospital, was not rendering or failing to render service conducive to health or of a professional nature and that said occurrence on said date does not fall within the "Exclusion" endorsement of Gulf's Policy No. GA 4 39 88 05, which had been issued to Gold Cross Ambulance

Service, Inc. and which was in full force and effect on said date.[1]

Counsel for defendants will prepare formal judgment in accordance with the foregoing.

---

1. Significantly the petition in the State case, of which copy is attached to the complaint herein, does not show the City, County, or State, in which the alleged injury occurred.