**William Joseph SMITH, Plaintiff,**

**v.**

**ST. PAUL GUARDIAN INSURANCE COMPANY, Defendant.**

**Civ. No. 85–3025.**

United States District Court, W.D. Arkansas, Harrison Division.

Nov. 25, 1985.

Walter R. Niblock, Fayetteville, Ark., and Terry M. Poynter, Mountain Home, Ark., for plaintiff.

Wm. Robert Still, Jr., Fayetteville, Ark., for defendant.

**MEMORANDUM OPINION**

H. FRANKLIN WATERS, Chief Judge.

### I. Introduction

This is a declaratory judgment action arising under 28 U.S.C. § 2201 to determine the duty, if any, on the part of the defendant insurer to defend the plaintiff in an alienation of affections action currently

pending in Baxter County Circuit Court. Jurisdiction and venue are properly in this court.

Defendant issued policies numbered 9LA6A2286 and 503XB3898 to the plaintiff, covering him for a blanket liability of $300,-000.00 and $1,000,000.00, respectively. It is admitted that the actions and conduct on the part of the plaintiff which allegedly constitute the tort of alienation of affections occurred during the policy period. A demand was made on the defendant to defend the plaintiff in the pending Baxter County tort action and the defendant has denied the existence of any duty to defend and has refused plaintiff's demand.

Both parties admit that there are no disputed questions of material fact and that the sole issue presented is one of law, *i.e.*, the construction and interpretation of the policy provisions with reference to defendant's contractual duty to defend. Accordingly, the action is before the court pursuant to the parties' cross-motions for summary judgment.

## II. The Policies

The underlying insurance policy is a Pak II "plain language" policy. The policy provides, *inter alia:*

> Pak II means broad personal protection. Your Pak II Personal Protection Policy covers you for claims others make against you. The common. And the uncommon. Up to $100,000.
>
> . . . .
>
> ... Pak II covers you and your family 24–hours a day anywhere in the world for accidents or incidents that happen during the policy term.
>
> . . . .
>
> All the personal insurance you may need....

(Policy, p. 1)

> ... Under the liability section of this policy you're covered when somebody makes a claim against you. We'll cover your legal liability up to $100,000 if you're involved in a covered accident or incident where there is property damage, personal injury or death....

> What's legal liability? Any injury, damage or loss that you're responsible for under the law.
>
> . . . .
>
> What do we mean by accident or incident? Anything that causes property damage, *personal injury* or death *without you expecting or intending it.* If you could've expected the result, you're not covered. The only exception is assault and battery committed to save a life or property (emphasis added).
>
> . . . .
>
> What is personal injury? Bodily injury of course, but also *injuries to a person's feeling or reputation. Like* mental injury. Mental anguish. Shock. Wrongful eviction. Libel. Slander. Defamation of character. Invasion of privacy. False arrest (emphasis added).

(Policy, p. 2)

> We'll pay for the cost of your defense, including investigation, lawyer's fees and court costs when *someone makes a claim* against anyone insured under this policy (emphasis added).

(Policy, p. 3)

> The umbrella policy provides, *inter alia:* The Company will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages, all as more fully defined by the term "ultimate net loss" on account of:
>
> 1. *Personal Injuries,*
> 2. Property Damage,
> 3. Advertising Offense,
>
> to which this Policy applies, caused by an *occurrence* (emphasis added).
>
> . . . .
>
> A. When underlying insurance *does not apply* to an occurrence:
> With respect to any occurrence not covered by the underlying policy(ies) of insurance ... but covered by terms and conditions of this Policy ... the Company will in addition to the amount of the ultimate net loss payable;
> (1) defend any suit against the insurer seeking damages on account of personal injury, property damage or advertising

offense even if such suit is groundless, false or fraudulent;

(Umbrella Policy, §§ I–II).

The term *"Occurrence"* means

(1) *with respect to subsection (a) of the definition of personal injuries ...* an event, .. which results in such personal injury, ... neither expected nor intended from the standpoint of the Insured; (emphasis added).

(2) *with respect to subsections (b) and (c) of the definition of personal injuries,* an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury.... (emphasis added).

The term "Personal Injuries," ... means (a) bodily injury, *mental injury, mental anguish, shock,* sickness, disability; (b) false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, *humiliation,* assault and battery committed for the purpose of preventing or eliminating danger to persons or property; (c) also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities (emphasis added).

(Umbrella Policy, *Definitions* 9, 10)

### III. Discussion

█ Defendant argues that alienation of affections is not included within the definition of "personal injury" in the coverage sections of the policies. Defendant further contends that even if alienation of affections is included in the term "personal injury," it is nonetheless excluded from coverage under the definition of "accident" and "occurrence." Defendant additionally asserts that to allow coverage for the tort of alienation of affections would violate the public policy of the state of Arkansas.

The primary policy, the Pak II, defines "personal injury" as including "injuries to a person's feeling or reputation. *Like* mental injury. Mental anguish. Shock. Wrongful eviction. Libel. Slander. Defamation of character. Invasion of privacy. False arrest" (emphasis added). In the umbrella policy the term "personal injuries"

includes the above as well as "sickness," "disability," "false imprisonment," "detention," "malicious prosecution," "humiliation," and "assault and battery" to protect persons or property.

Thus, if the injury sustained by the complainant in the alienation of affections action includes any injury to his feeling similar to mental anguish, shock, or humiliation, then the complainant has alleged a "personal injury" as defined by the policies. This does not necessarily resolve the issues of coverage or the duty to defend, but it does initially disclose whether the injuries sustained by the complainant fall within those against which plaintiff is insured.

The complainant seeks damages for loss of "consortium, comfort, companionship, love, affection and society of his wife."

The court notes that the term "comfort" includes things which bring ease, contentment, and enjoyment, *Strite v. McGinnes,* 330 F.2d 234 (3rd Cir.1964), and denotes whatever is necessary for physical, mental and spiritual fulfillment. *Emmert v. Old Nat. Bank,* 246 S.E.2d 236. In essence, then, the complainant seeks compensation for the loss of contentment, enjoyment and physical, mental and spiritual fulfillment he received from his wife's companionship, love and affection during the marriage. The court believes that this is merely another way of stating that the complainant has allegedly suffered a mental injury "like" mental anguish, shock and humiliation because of the plaintiff's conduct. The injury alleged is not a bodily injury, as that term is normally understood, nor a financial one, but rather is an emotional deprivation occasioned by the loss of the complainant's wife's affections. Where adultery is involved it is clear that the primary remedy is damages for emotional distress. *See Restatement (Second) of Torts* § 685 comment g at 485. As Professor Prosser notes in his treatise: "There has been a gradual shift of emphasis away from 'services' and toward a recognition of more intangible elements in the domestic relations, such as companionship and affection." Prosser,

*Law of Torts* § 118 at 895. To maintain the alienation of affections action, "it is not necessary that the wife commit adultery, or that the husband be deprived of any household services, or suffer any pecuniary loss; nor is it necessary that the wife abandon his home, or that there be more than a partial loss of her affections and attentions. The gist of the tort is thus an interference with the wife's mental attitude toward the husband, and the conjugal kindness of the marital relation...." Prosser, *supra*, at 897–98. The alienation tort is, thus, based upon an interference with the consortium of the spouse. *Orlando v. Alamo*, 646 F.2d 1288 (8th Cir.1981) (applying Arkansas law).

Damages caused by a loss of the consortium of a spouse are routinely "passed along" to insurers in accidental personal injury actions. The injuries suffered by the complainant are clearly injuries to his "feeling" "like" mental injury, anguish, shock and humiliation. Had the plaintiff accidently mortally wounded the complainant's wife, rather than merely "alienated" her affections, the court believes that the injuries sustained by the complainant, including loss of consortium, sex and comfort, would clearly constitute "personal injuries" within the meaning of the policies and would be compensable thereunder, assuming all other criteria are satisfied. This being the case, there is no reason why the same elements of damage standing alone would not qualify as "personal injuries" under the policies.

The "plain-language" Pak II policy lacks precision and clarity in defining the term "personal injuries," as defined by the *nonexclusive* list of examples included therein, and in the court's view is ambiguous. The term, as defined, is fairly capable of construction as including the injuries suffered by the complainant. The terms of this policy are to be construed against the defendant, and any doubt as to the meaning of any provision is to be construed in favor of the plaintiff. *Schulte v. Benton Savings and Loan Ass'n*, 279 Ark. 275 (1983).

The court concludes that the terms "personal injuries" in the Pak II policy and "personal injury" in the umbrella policy include those elements of damage involved in complainant's tort action against the plaintiff.

■ Nonetheless, as noted, this does not, of itself, resolve the ultimate issues. Although the complainant's injuries are "personal injuries" within the meaning of the Pak II policy, before these injuries are covered it must appear that the injuries arose from a "covered accident or incident." "Covered accident or incident" is defined as "anything that causes property damage, personal injury or death without (the insured) expecting or intending it." In the umbrella policy, "occurrence" means, with regard to mental injury, anguish or shock, "an event ... which results ... in such personal injury ... neither expected nor intended from the standpoint of the insured." "Occurrence" means, with respect to "humiliation," "an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury...."

If the Pak II policy does not apply to a covered "occurrence" as defined by the umbrella policy, the defendant must "defend any suit against the insured seeking damages on account of personal injury...." (See Umbrella Policy § II.A(1)). If the Pak II policy does apply to an "occurrence" as defined by the umbrella policy, the insurer "shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the Insured resulting from the same occurrence" if the umbrella policy otherwise applies, where the limits of liability of the Pak II policy are exhausted and where the umbrella policy is immediately in excess of the Pak II policy without intervening excess insurance. (See Umbrella Policy, § II.B). Therefore, the court will first examine whether the personal injuries suffered by the complainant may have arisen from a "covered accident or incident" as defined by the Pak II policy.

As Prosser points out, the gist of the tort is an interference with the wife's mental

attitude toward the husband. Prosser, *supra,* at 898. The vast majority of cases historically have been brought against "the meddling mother-in-law" rather than the "wicked lover." At common law there were two primary rights involved in such actions: one is the "right" of the plaintiff to the body of the wife "and the other to her mind, unpolluted." Prosser, *supra,* at 898 n. 6, *quoting Sullivan v. Valiquette,* 666 Colo. 170, 180 P. 91 (1919).

In order to be held liable, the tortfeasor must have acted affirmatively and successfully, affecting the marital relation and this must be the cause of the diminished affection of the wife for the husband. *Hvasta v. McGough,* 276 Ark. 168, 633 S.W.2d 31 (1982). It is not necessary that the tortfeasor act with ill will toward the plaintiff. *Hodge v. Brooks,* 153 Ark. 222, 240 S.W. 2 (1922); *Boland v. Stanley,* 88 Ark. 562, 115 S.W. 163 (1909); *Alexander v. Johnson,* 182 Ark. 270, 31 S.W.2d 304 (1930). Arkansas courts have held that after a complete and permanent breach of the relation by desertion, there can be no liability for alienation of the affections of the deserting spouse. *Adams v. Carrier,* 214 Ark. 55, 214 S.W.2d 781 (1948). It has also been held, however, that the action will not be defeated by separation, because a third person has no right to meddle with the affections of a married person until the marriage is terminated by death or divorce. *Gibson v. Gibson,* 244 Ark. 327, 424 S.W.2d 871 (1968) (citing no Arkansas cases for this proposition). Parents are privileged to interfere unless they act from "bad or unworthy motives," *Boland v. Stanley, supra,* although in case of a stranger the causes must be extreme to warrant interference.

It is alleged in the alienation of affections action that the present plaintiff "unlawfully and maliciously, by means of devious wiles, manifestations of affections and misrepresentation, did lessen and wean the affections of" complainant's wife from him. The tort of alienation of affections, as historically defined and as apparently alleged by the complainant, clearly involves "intentional" conduct on the part of the tort-

feasor. Because alienation of affections involves intentional conduct, defendant argues that coverage under the policy is necessarily excluded.

The Pak II policy thus purports to exclude coverage for conduct of the insured in those cases where the insured intended or expected the result. Nonetheless, two paragraphs later the policy portends to extend coverage to injuries sustained "like" mental injury, mental anguish, shock, wrongful eviction, libel, slander, defamation of character, invasion of privacy and false arrest.

In Arkansas, recovery for mental anguish requires a showing of intentional conduct unless there is an independent tort involved or some manifestation of physical injury. The tort is itself termed "the intentional infliction of emotional distress." *M.B.M. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980); *See also* 4 Ark.L.J. 343 (1981). Without intentional conduct recovery is limited to situations where a physical injury is involved or an independent tort is committed. If coverage for all intentional conduct is excluded from coverage, mental anguish is compensable under the policy only where an independent tort or physical injury is involved. Yet, unless one were learned in the law one would not be aware of this restriction.

Similarly, false arrests are explicitly included within the policy coverage. Yet, there is no false imprisonment unless the defendant intends to cause the resulting confinement, whether of the plaintiff or another. Prosser, *supra,* § 12 at 60. Recovery may be had without proof of actual damage. Prosser, *supra,* at 55. "Since the injury is in large part a mental one, (the plaintiff) is entitled to damages for his mental suffering, humiliation and the like." Prosser, *supra,* at 56.

Therefore, although the language of the policy seemingly excludes coverage for intentional acts, it expressly includes coverage for "false arrest," which requires no proof of actual injury and can only be committed by one who intentionally causes

the result, it being presumed that "mental suffering, humiliation, and the like" will result. Coverage for false arrest is either illusory or the intentional result exclusion is fraught with numerous unseen holes.

Additionally, the policy specifically covers "invasions of privacy." Yet, most forms of invasion of privacy require intentional conduct on the part of the defendant. "Intrusion" is the intentional invasion or intrusion upon plaintiff's physical solitude, seclusion or private matters. *See generally* Prosser, *supra,* § 112 at 833–34. Similarly, intentional public disclosure of private facts is historically actionable as an invasion of privacy, even if the facts disclosed are true. *See generally* Prosser, *supra,* at 834–37. The invasion of privacy "sub-tort" of "appropriation" requires intentional appropriation for the defendant's benefit or advantage, of the plaintiff's name or likeness. *See generally* Prosser, *supra,* at 839–42. It is generally agreed that, apart from potential constitutional considerations that may be applicable to some forms of invasion of privacy, plaintiff need not plead or prove special damages. Prosser, *supra,* at 844. Thus, these forms of invasion of privacy require no proof of actual injury and require intentional conduct on the part of the defendant. Nonetheless, actions of this nature are seemingly expressly covered by the policy. Here, too, then, coverage for invasion of privacy is either wholly illusory or there is a very obvious and evident gap in the intentional act exclusion.

It is apparent that the policy cannot factually or legally do what it purports to do, *i.e.,* extend coverage for injuries "like" mental anguish, shock, false arrest and invasion of privacy, and at the same time exclude all intentional acts from coverage. It seems that defendant "giveth" and defendant "taketh" away on the same page of the policy. The policy is clearly ambiguous with respect to whether intentional infliction of mental distress, false arrest, invasion of privacy, and actions "like" them are covered. In such a case, the presence of the ambiguities indicates that there may be coverage. *Schulte, supra.*

Alienation of affections is not expressly mentioned either in the coverage provisions nor in the exclusion provisions of the policy. Because the court believes that the "injuries" and conduct involved in an alienation of affections action are "like" those involved in the torts of intentional infliction of mental distress, false arrest, and invasion of privacy, which reasonably can be construed as being covered by the policy, the court concludes that the Pak II policy imposes a duty to defend an alienation of affections action on behalf of the plaintiff. The court notes that coverage for "assault and battery" is specifically excluded unless committed to save a life or property. Had the defendant so chosen it could have easily excluded coverage for alienation of affections in this "plain language" policy in so many words without leaving a layman to guess as to whether alienation of affections is covered because it is "like" those specifically listed covered injuries. Defendant must suffer the risk of any imprecision employed in the policy. "The courts strictly interpret exclusions from insurance coverage and resolve all reasonable doubts in favor of the insured...." *Commercial Union Ins. Co. of America v. Henshall,* 262 Ark. 117, 553 S.W.2d 274 (1977).

The court concludes that liability for the alleged injury is not clearly excluded from coverage under the Pak II policy. Because the defendant's indemnity liability for the alleged alienation of affections action is ambiguous to say the least, the court concludes that the defendant has the obligation to defend the plaintiff in the pending tort suit under the provisions of the Pak II policy.

Numerous cases have held that several of the "intentional or expected act" exclusions commonly employed are either inherently ambiguous or may be ambiguous depending on the particular facts of the case. *See Baldinger v. Consolidated Mut. Ins. Co.,* 11 N.Y.2d 1026, 230 N.Y.S.2d 25, 183 N.E.2d 908 (1961); *Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 54 Cal.Rtpr. 104, 419 P.2d 168 (1966); *Dochod v. Central Mut.*

*Ins. Co.*, 81 Mich.App. 63, 264 N.W.2d 122 (1978); *Patrons-Oxford Mut. Ins. Co. v. Dodge*, 426 A.2d 888 (Me.1981); *Farmers Ins. Group v. Sessions*, 100 Idaho 914, 607 P.2d 422 (1980); *Grinnell Mutual v. Frierdich*, 79 Ill.App.3d 1146, 35 Ill.Dec. 418, 399 N.E.2d 252 (1979).

In the instant case, not only is there whatever ambiguity may be inherent in the terms themselves and under the particular situation presented, the ambiguity is further exacerbated in the Pak II policy by the specific inclusion of several intentional torts and the use of the word "like" in the clause which extends coverage to those listed injuries and those "like" them. Whether one injury or action is "like" another in many cases is open to a reasonable dispute.

Ambiguity in the umbrella policy is heightened by the explicit inclusion of several injuries and actions of an intentional nature in Definitions number 10(b) and (c), which, unlike those listed in number 10(a), have no exclusion at all for "intended or expected" results.

The court notes that defendant includes in its brief the umbrella policy definition of "occurrence" as it pertains to subsection (a) of the definition of personal injuries, which specifically excludes expected or intended injuries. The silence of defendant in its failure to include the policy definition as it pertains to subsections (b) and (c) of the definition of personal injuries, which has no exclusionary clause, is deafening.

If the underlying insurance, the Pak II policy, applies to an "occurrence" as defined by the umbrella policy, the umbrella policy also requires the defendant "to assume charge of the settlement or defense" where the limits of the underlying policy are exhausted. (Umbrella Policy § II.B.) Where bodily injury, mental injury, mental anguish, shock, sickness or disability are involved, the term "occurrence" means "an event ... which results in such personal injury ... neither expected nor intended from the standpoint of the Insured." However, where false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, humiliation, assault and battery committed to prevent danger to persons or property, libel, slander, defamation of character or invasion of privacy are involved, then "occurrence" means "an act or series of acts of the same or similar nature, committed during this policy period which causes such personal injury." As noted, there is no intentional act exclusion with respect to the latter injuries.

Although the injuries sustained by the alienation of affections plaintiff can be classified as "mental anguish" or "shock" within Definition number 10(a) of the umbrella policy, they are equally capable of reasonable categorization as "humiliation" within the definition of "personal injuries" in Definition number 10(b), and the conduct complained of is more akin to the injuries listed in Definitions number 10(b) and (c) than those listed in Definition number 10(a). Resolving all reasonable doubts in favor of the plaintiff who had no part in the preparation of the contract, *Henshall, supra,* the court believes that the alleged conduct of the insured may well constitute an "occurrence" as defined by the umbrella policy. Because the court concludes that the underlying policy, the Pak II, also applies to the occurrence, the defendant is obligated by the umbrella policy to assume charge of the defense in the event the limits of liability of the Pak II policy are exhausted. This conclusion is of diminished importance because defendant is the insurer under both policies, however, the court believes the foregoing analysis provides a more comprehensive picture of the insurer's duty to defend in this case.

Even if the Pak II policy was inapplicable to the events at issue, the court nonetheless concludes that the umbrella policy would require the defendant to defend the plaintiff in the pending tort suit.

Section II.A. of the umbrella policy states:

When underlying insurance does not apply to an occurrence:

With respect to an occurrence not covered by the underlying ... insurance, but covered by terms and conditions of this Policy ... the Company will ...; (1) de-

fend any suit against the Insured seeking damages on account of personal injury ... even if such suit is groundless, false or fraudulent....

As noted, the court believes that the "occurrence" alleged in complainant's action may be "covered by terms and conditions of (the umbrella policy)." If such is the case, then it makes little difference whether the duty to defend arises from a covered "accident or incident" within the meaning of the Pak II policy, or from a covered "occurrence" as defined in the umbrella policy. If the Pak II policy applies, then the duty to defend arises from that policy. If the Pak II policy does not apply, then the duty to defend arises under the terms and conditions of the umbrella policy. Either way, the court concludes that the policies impose an obligation to defend the plaintiff against the complainant's alienation of affections action.

Defendant finally argues that to find a duty to defend the alienation of affections suit under the policies would violate the public policy of the state of Arkansas, because "if a single insured is allowed through intentional acts to consciously control risk covered by the policy, the central concept of insurance is violated." However, as noted, the Pak II policy expressly provides coverage for three sub-torts of invasion of privacy and false arrest or imprisonment which require intentional conduct. It is difficult, if not impossible, to even envision an actionable non-intentional invasion of privacy for example. The policy also explicitly provides coverage for assault and battery committed to save a life or property. Presumably, under this language, there would be coverage if plaintiff used a baseball bat on a ten-year-old to protect his garden hose. If the only intentional conduct which is covered is that which is legally justifiable in nature, then the defendant's promises of indemnity for assault and battery, invasion of privacy or false imprisonment are mere wisps of smoke, for in those cases there would be no liability in the first place.

The umbrella policy expressly covers false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, humiliation, assault and battery to prevent danger to persons or property, libel, slander, defamation of character and invasion of privacy. As noted, there is no intentional conduct exclusion with regard to these injuries, as there is with regard to bodily injury, mental injury, mental anguish, shock, sickness and disability. It is unimaginable how one could commit the tort of malicious prosecution without "intending" or being able to "expect" the result. The defendant is not in any position to forcefully argue that insurance coverage for intentional conduct violates public policy when it has expressly included many examples of such conduct within the coverage.

There is nothing in the state's public policy that prevents an insurer from indemnifying its insured against punitive damages arising from an "accident." *Southern Farm Bureau Cas. Ins. Co. v. Daniel,* 246 Ark. 849, 440 S.W.2d 582 (1969). Under Arkansas law, before punitive damages arising from an "accident" may be imposed, it must appear that the defendant "knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in reckless disregard of the consequences from which malice may be inferred." *Arkansas Model Jury Instructions (Civil)* 2217. If there is no public policy against such *punitive* damages being "passed along" through insurance, the court can see no public policy barrier to the indemnification against *compensatory* damages arising from similar conduct. Punitive damages, after all, are designed to "punish a wrongdoer and to deter others from similar behavior." *AMI* 2217. Yet, though punitive in nature, the Arkansas Supreme Court allows them to be "passed through" to the insurer, in cases of "accident."

Further, compensatory damages are designed to compensate the plaintiff, not punish the defendant. Should a defendant be a

judgment-proof "turnip," then a deserving plaintiff will be deprived of a remedy if there is a "public policy" that prohibits liability indemnification for compensatory damages simply because the injury "could" have been "expected." Given a choice, this court should interpret the public policy of this state in such a manner as to further the availability of compensation for those who have been wronged rather than force a construction that will inure to the detriment of judgment-proof tortfeasors only marginally and in principle, while providing nothing to their victims.

If the public policy of this state allows indemnification for *punitive* damages based upon the wrongdoer's conduct in acting with reckless disregard of the consequences while knowing that his conduct would naturally result in injury, *Daniel, supra; AMI* 2217, the court foresees no bar to indemnification for liability for *compensatory* damages based upon the allegedly tortious conduct of the plaintiff.

It is factually possible in the alienation of affections action that the plaintiff in this action acted intentionally, but that the results were unintentional. In such a case there would be coverage and a duty to defend under this policy. *Talley v. MFA Mut. Ins. Co.,* 273 Ark. 269, 620 S.W.2d 260 (1981). In *Talley* the Arkansas Supreme Court rejected the classic tort doctrine that a tortfeasor necessarily "intends" the natural and probable consequences of his actions for purposes of contract construction. Whether the plaintiff in this action did in fact intend the actual result which obtained is, of course, a fact question that cannot be resolved by mere reference to the complaint.

The duty to defend cannot be determined solely from the tort complaint in this case. "The duty to defend is broader than the duty to pay damages and the duty to defend arises where there is a possibility that the injury or damage *may* fall within the policy coverage." *Henshall, supra,* 262 Ark. at 123, 553 S.W.2d 274 (emphasis added). If the duty to defend could be delineated solely by the allegations of the tort complaint, there would never be any duty to defend the insured in an action for assault and battery, for example, although there is coverage for such if committed to save a life or property, because few tort plaintiffs will allege in the complaint that they were assaulted by the insured while the insured was protecting a life or property. There would clearly be a duty to defend in such a case, however, as there is here, because there is a "possibility that the injury or damage *may* fall within the policy coverage." *Henshall, supra.*

Even if coverage and the duty to defend are co-extensive, as defendant urges, then if the plaintiff did not intend the results of his actions, in which case there would apparently be coverage, there would be a duty to defend. That there may be no tort *liability* if plaintiff did not intend the results, and therefore no liability for indemnification on the part of defendant, does not mean there is no duty to defend. The lack of indemnification liability in such a case would spring from the fact that the complainant failed to prove a cause of action, not because the policy excludes such a case from coverage, which it does not. There is a possibility of "coverage" regardless of whether the conduct constitutes a cause of action. By the very terms of the Pak II policy, there is coverage if a personal injury arises from "anything that causes ... personal injury ... without (the insured) expecting or intending it." Further: "We'll pay for the cost of your defense, including investigation, lawyer's fees and court costs when someone *makes a claim* against anyone insured under this policy." Under the umbrella policy, there is coverage if the conduct results in "humiliation," regardless whether it is intended or expected. No requirement is stated that the conduct constitute a cause of action. The umbrella policy clearly states that there is a duty to defend "even if such suit is groundless, false or fraudulent." Plaintiff doubtlessly contends that the tort suit is groundless, false or fraudulent.

Defendant cites *Eberdt v. St. Paul Fire & Marine Ins. Co.,* 36 Or.App. 679, 585

P.2d 711 (1978), in support of its position. In that case the Oregon Court of Appeals ruled that alienation of affections constitutes an intentional infliction of injury and that public policy prevents an insurer from providing coverage for intentional wrongful acts. However, in the present case, defendant has expressly covenanted to provide coverage for several intentional acts, and it has been held that coverage for intentional acts is not necessarily precluded by Arkansas' public policy: "Furthermore, we see no violation of public policy in allowing recovery in circumstances in which it is shown the results were accidental or unintended," *Talley* 273 Ark. at 274, 620 S.W.2d 260, or in cases arising from an "accident" where the defendant knew or should have known that his conduct would naturally result in injury. *AMI* 2217. In such cases as the latter group, it can hardly be said that the results could not be "expected." It is precisely *because* they could be expected that punitive damages are allowed. Yet *Daniel, supra,* allows coverage in those situations. *See also Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (1973); *Smith v. Moran,* 61 Ill.App.2d 157, 209 N.E.2d 18 (1965).

Although it is alleged in the tort action that the present plaintiff "unlawfully and maliciously, by means of devious wiles, manifestations of affections and misrepresentation, did lessen and wean the affections of Mrs. Asta" from Mr. Asta, "malice" is not a necessary element of alienation of affections. *See Alexander v. Johnson,* 182 Ark. 270, 31 S.W.2d 304 (1930); *Porter v. Lincoln,* 282 Ark. 258, 668 S.W.2d 11 (1984), nor are "devious wiles, manifestations of affections and misrepresentation." Therefore, insofar as the essential elements are concerned, the complaint alleges simply that the present plaintiff "lessened and weaned" Mrs. Asta's affections from Mr. Asta. It remains possible that the plaintiff did not intend to do so, although he may have taken whatever course of action he took intentionally.

The defendant erroneously cites *C.N.A. Ins. Co. v. McGinnis* 10 Ark.App. 234, 663 S.W.2d 182 (1984), a case involving the sexual abuse of a minor. Defendant undoubtedly intended to cite 282 Ark. 90, 666 S.W.2d 689 (1984) which reversed the decision of the Court of Appeals which had affirmed the trial court. The Supreme Court held that as a matter of *fact* the insured in that case expected or intended to cause injury to the stepdaughter and that the opinion to the contrary of the experts, the insured, the trial court, and the Court of Appeals, was clearly erroneous. The Supreme Court did not hold, however, that such intent could be presumed, and because of *Talley,* the question remains a factual issue. *See McGinnis,* 282 Ark. 90, 93, 663 S.W.2d 689 (Hollingsworth, J., dissenting).

Regardless of the consistency of the Supreme Court's decision in *McGinnis* with *Talley,* this court believes that a "mature man's deliberately debauching his six-year-old stepdaughter and continuing to do so for years" is a far, far different case from the instant case presented wherein it is alleged merely that because of certain conduct of the plaintiff, Mrs. Asta's affection for Mr. Asta has diminished.

The court concludes, in light of the above, that defendant has a duty to defend the plaintiff in the pending alienation of affections action, and that the actions of the plaintiff in this case may constitute an "accident or injury" within the meaning of the Pak II policy and an "occurrence" within the meaning of the umbrella policy.

In summary, there is a duty to defend under the Pak II policy because the injury involved constitutes a personal injury within the meaning of the policy, and it is possible that the plaintiff may not have intended the results. There is a duty to defend under the umbrella policy because the injury is a personal injury within the meaning of that policy which does not exclude coverage or numerous injuries including humiliation, even if intentionally caused. Further, there may be a duty to defend as well as liability under the ambiguous language of both policies. However,

it is unnecessary to decide this issue and the interplay of public policy definitively at this time inasmuch as there are material issues of fact with respect to the *mens rea* of the plaintiff in the underlying tort action which may have significant bearing on the resolution of the issue of liability. The court cannot and should not resolve the factual issues on a motion for summary judgment, particularly where the court's file consists only of the complaint, answer, cross-motions and copies of the policies. The court has not been provided with any of the pleadings in the tort action and does not know the exact contentions or defenses involved.

Plaintiff's motion for summary judgment will be granted with respect to the defendant's duty to defend him in the tort action. Plaintiff's and defendant's cross-motions for summary judgment with respect to liability, attorney's fees and penalty will be denied at this time and "must be postponed until after the facts are developed at trial of the personal injury action." *Henshall, supra,* 262 Ark. at 124, 553 S.W.2d 274.

A separate order in accordance herewith will be concurrently entered.