**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff,**

v.

**Martin HOLLINGSWORTH, et al., Defendants.**

Civ. No. 90–5095.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

March 15, 1991.

**1356**

James M. Roy, Jr., Roy & Lambert, Springdale, Ark., for plaintiff.

Don R. Elliott, Odom & Elliott, Leslie Borgognoni, Fayetteville, Ark., for defendants.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

Currently pending is the motion of the plaintiff, State Farm Mutual Automobile Insurance Company, for summary judgment. Defendants, Martin Hollingsworth and Leslie Borgognoni have timely responded. At issue is the interpretation of an automobile liability insurance policy issued to William Jordan, deceased, by the plaintiff.

### I. *Factual Background*

Martin Hollingsworth is the Administrator of the Estate of Jeanette Hollingsworth and Leslie Borgognoni is a Special Administrator of the Estate of William Jordan. William Jordan was involved in an automobile accident on March 24, 1990. On that date, Jordan was operating his 1983 Chevrolet pickup truck and Jeanette Hollingsworth was a passenger in the pickup. William Jordan was Jeanette Hollingsworth's father. Jeanette Hollingsworth was killed instantly in the accident.

Jordan's pickup truck is the named vehicle in a policy of insurance issued to him by plaintiff, State Farm. State Farm contends that Jeanette Hollingsworth was "residing" with her mother and father (Marie Jordan and William Jordan) at their address of 1128 Baldwin, Fayetteville, Arkansas, because of marital problems Jeanette Hollingsworth had experienced in her separate marital home in Jonesboro. State Farm relies upon an exclusion in the policy (exclusion ¶ 2(c) page 7) which provides:

There is no coverage ...

\*  \*  \*  \*  \*  \*

2. For any bodily injury to:

\*  \*  \*  \*  \*  \*

(c) any insured or any member of an insured's family residing in the insured's household.

(policy, p. 7).

State Farm argues that there is no liability coverage for Jeanette Hollingsworth's claim against Jordan because she is both "an insured" and a "member of an insured's family residing in the insured's household."

The policy defines "an insured", as used in the policy:

Who is an Insured ...

1. you;
2. your spouse;
3. the relatives of the first person named in the declarations;
4. any other person while using such a car if its use is within the scope of consent of you or your spouse; and
5. any other person or organization liable for the use of such a car by one of the above insureds.

(policy, p. 6).

State Farm first says that liability coverage of Jeanette Hollingsworth's claim against Jordan is excluded by definitions 3 and 4 above. Exclusion 2(c) as affected by definition 3 excludes liability coverage for claims made by "the relatives of the first person named in the declarations." The declarations page reflects William Jordan as the only person so named. Therefore, urges State Farm, Jeanette Hollingsworth's liability claim is not covered because she is a "relative" of William Jordan. "Relative" is defined as "a person related to (William Jordan or Marie Jordan) by blood, marriage or adoption who lives with William Jordan." (Policy, p. 3). It is not disputed that Hollingsworth is Jordan's daughter.

The term, "insured," excluded from coverage under Exclusion 2(c), as defined by definition 4, above, includes "any other person *while using*" the insured vehicle if its

use is within the scope of consent of William Jordan or his spouse. Thus, Jeanette Hollingsworth's claim against William Jordan is excluded from coverage if she received bodily injury "while using" the pickup. The question here, then, is whether Jeanette Hollingsworth, riding as a passenger in Jordan's pickup truck, was injured "while using" the pickup.

Whether Hollingsworth was a "relative" of Jordan and whether she was "using" the pickup pertain to whether she was "an insured" for purposes of Exclusion 2(c). In other words, if Hollingsworth was a "relative" or was "using" the vehicle with Jordan's consent, she is "an insured" within the meaning of Exclusion 2(c) for whose claims coverage is not extended.

Even if Jeanette's claim survives exclusion under the "any insured" portion of Exclusion 2(c), she must also fall outside of the class of "member(s) of an insured's family residing in the insured's household" in order to fully escape the provisions of 2(c). The parties have primarily directed their arguments to the issues of whether Hollingsworth was "using" the vehicle and whether she was a "member of an insured's family *residing* in the insured's household."

Thus, to put the argument into syllogism form, under the so-called "plain language" policy, if Hollingsworth "lived" with Jordan, she is a "relative" of William Jordan. If she is a "relative" of William Jordan, she is an "insured" as defined on page 6 of the policy. If she is an "insured" as defined on page 6, then liability claims made by her are excluded from coverage under 2(c) on page 7 of the policy. Obviously, then, the pivotal questions here are whether Hollingsworth either "lived with" Jordan for purposes of the "insured" portion of Exclusion 2(c) or whether she was a "member of (Jordan's family residing in (his) household" for purposes of the latter portion of Exclusion 2(c). Because these questions require examination of the same factual scenario, they will be addressed together.

The parties have submitted the deposition testimony of Marie Jordan. Mrs. Jordan stated that Jeanette was a daughter of her marriage to William Jordan (p. 4, Jordan deposition). According to Mrs. Jordan, Jeanette Hollingsworth married Marty Hollingsworth on September 16, 1985, giving birth to two children, the first, on December 29, 1985. During the marriage Jeanette encountered marital discord and at one time she left the marital home to go to the Battered Women's Shelter. (Jordan deposition, p. 7). Some period of time later, Jeanette telephoned her father, William Jordan, and asked that he come "pick her up" from Jonesboro. Both Marie and William Jordan went to get Jeanette (Jordan deposition, p. 20).

According to Mrs. Jordan, Jeanette wanted to move back in with her parents because she was the only one working in her marital home and could not adequately support the children. Jeanette had not, at this time, informed her husband, of her intention to leave the marital home (Jordan deposition, p. 21). Six persons, including the children, Mrs. Jordan, William Jordan, Ben Skaggs, and another adult drove in Mr. Skaggs' station wagon to inform Marty Hollingsworth that Jeanette was moving back in with her parents. According to Mrs. Jordan, at that time, Jeanette told Marty she did not wish to continue living with him (Jordan deposition, p. 22). She gathered "a bunch of things" into boxes including clothing for herself and the children. Mrs. Jordan said that it was her "understanding" that Jeanette intended to permanently leave Marty (Jordan deposition, p. 23).

Having perhaps been made somewhat aware of the legal issues, Mrs. Jordan testified that Jeanette did not thereafter "live with" Mr. and Mrs. Jordan, but admitted that Jeanette spent the night at their home "every night that she was back in Washington County, up until the time of the accident." (Jordan deposition, p. 24). This was a period of seven nights. During this time, Jeanette never indicated how long she intended to remain at the Jordan residence, but Mrs. Jordan said that Jeanette was welcome as long as she wished to stay. While spending her nights with the Jordans, Jeanette spoke with Marty by tele-

phone at least once. (Jordan deposition, p. 26).

Mrs. Jordan testified that during the period following the trip to get Jeanette, Jeanette indicated that she intended to file suit for divorce against Marty. Jeanette had no automobile at this time.

There is some indication that on the day of the accident the roads were icy in spots. Mr. Jordan and Jeanette had taken the children to Marty's parent's home on Highway 16, east of the Jordan's home on Baldwin in Fayetteville. They were in the process of returning home when the accident occurred. The purpose of that trip was as indicated, to deliver the children to the home of Jeanette's husband's parents (Jordan deposition, p. 42). Marty's mother, Jo Belle Hollingsworth, had requested that the children visit that evening. Jeanette had a date scheduled that evening with a man named Steve Sharp, who arrived at the Jordan home after the accident. (Jordan deposition, p. 49). Plaintiff is quick to note that on the proof of claim executed by Mrs. Jordan, she indicated that Jeanette's residence was 1128 Baldwin, the address of the Jordans.

Defendants have submitted portions of the deposition of Stephen Hancock. Who he is and what his relationship is to the controversy are not readily apparent. However, it appears from the tidbits of depositions submitted that Jeanette, Marty and the Hollingsworth children lived with Stephen and Carolyn Hancock in Jonesboro before Jeanette returned to Fayetteville for the week prior to the accident. Mr. Hancock testified that Jeanette merely returned to the Jordans' home "for a visit," and that the "visit" had been planned several times, but postponed until that occasion. Jeanette allegedly told Mr. Hancock she would be back in a few weeks (Hancock deposition, p. 24). He related that at the time she left, she did not intend to obtain employment while in Fayetteville. According to Mr. Hancock, Jeanette was tentatively scheduled to return to the marital home approximately one week after she died (Hancock deposition, p. 24). Jeanette did not take enough of her belongings or those of the children to last more than a week or two, but rather "bare necessities for a short visit." (Hancock deposition, p. 27). Carolyn Hancock confirmed this testimony. She indicated that Jeanette obtained a job while visiting her parents hoping to earn sufficient money to enable Marty to repair their automobile, in order that Marty could come get Jeanette and the children and take them back home to Jonesboro. However, regardless of whether Jeanette had earned any money, the Hancocks indicated that they had planned to loan Marty the necessary money and/or transportation for the trip (Hancock deposition, p. 45). Carolyn indicated that Jeanette and Marty did not generally argue or fight, to her knowledge.

Dorothy Skaggs, on the other hand, testified that Jeanette obtained a job while staying with her parents, with the intention of renting an apartment or house in which she and the children could live without Marty (Skaggs deposition, p. 10). Jeanette purportedly did not like living with her mother and did not get along well with her. Jeanette's mother allegedly did not like the fact that Jeanette was "seeing another guy ... before she left Marty" and continued to do so afterwards, and Mrs. Jordan further disapproved of Jeanette's use of alcohol and drugs (Skaggs deposition, p. 12).

Marty Hollingsworth testified that Jeanette had planned all along to return home to him after a couple of weeks with her parents. He indicated that Jeanette's father was well aware of this. No other testimony has been submitted for consideration.

## II. *Discussion*

The exclusion at issue is commonly referred to as a "family" or "household" exclusion. Such exclusions have been upheld as not violative of the public policy of the State of Arkansas nor inconsistent with the financial responsibility laws. *See Cook v. Wausau Underwriters Ins. Co.,* 299 Ark. 520, 772 S.W.2d 614 (1989); *State Farm Mut. Ins. Co. v. Cartmel,* 250 Ark. 77, 463 S.W.2d 648 (1971). Review of similar cases is informative, but not dispositive.

In *Southern Farm Bur. Cas. Ins. Co. v. Williams*, 260 Ark. 659, 543 S.W.2d 467 (1976), the insured's daughter stayed with her parents while her husband served in the military. The insured borrowed the vehicle owned by his daughter and her husband and, while using the vehicle, struck a pedestrian. Because the automobile was owned by and furnished for the regular use of the daughter, who was at that time, a member of the insured's household, the insurer denied coverage.

The Arkansas Supreme Court noted that the nineteen-year-old daughter had resided with her parents off and on for more than a year, primarily while her husband was overseas. The court found that the insured parents exercised no control over the daughter, that she contributed no money, had no outside employment, and was claimed by the insured as a dependent for tax purposes. The court then reviewed prior relevant cases:

> We have had occasion to interpret the term 'household' in a theft insurance policy which excluded coverage if it was found that the plaintiff's son, serving in the military, was not a 'household' member. In affirming a finding that he was a member, we said in *Central Manufacturer's Mut. Ins. Co. v. Friedman*, 213 Ark. 9, 209 S.W.2d 102 (1948), in pertinent part:
>
>> We think the word 'household' as used in this section of the policy, *supra*, meant domicile, residence or place of abode. 'Household' is defined in Bouvier's Law Dictionary, Rawle's Third Revision, vol. 2, page 1462, as follows: 'Those who dwell under the same roof and constitute a family.'
>
> In *Lontkowski v. Ignarski*, 6 Wis.2d 561, 95 N.W.2d 230 (1959), the court defined the word 'household' as follows:
>
>> 'Household' is defined by Webster as 'those who dwell under the same roof and constitute a family.' That definition corresponds with the common and approved usage of the term and is supported by judicial authority. 'Persons who dwell together as a family constitute a household.'

*Williams*, 260 Ark. at 662–63, 543 S.W.2d 467. The court held that the daughter was a member of her father's household:

> Under the undisputed facts, Carol came to 'stay' with her parents while her husband was overseas. While she did not intend to stay permanently with her parents, nevertheless her stay was to extend for an indefinite time. She was not a mere temporary visitor.... The language of the policy here involved is not legally ambiguous. Such language excludes liability of the insurer under the facts shown.

Thus, *Williams* suggests that the term "household" includes married family members separated by military service from their spouses, and actually residing in the parents' home intending to stay for an indefinite time. *Williams* suggests further that "temporary visitors" are not "members" of such a "household."

The cases regarding family or household exclusions are legion. However, because each case depends on the particular fact situation and the policy language which differs significantly from case to case, only a few need be examined to acquire an understanding of the general approaches used.

In *State Farm Mut. Auto. Ins. Co. v. Hanna*, 277 Ala. 32, 166 So.2d 872 (1964), the family exclusion clause at issue excluded coverage for "bodily injury to ... any member of the family of the insured residing in the same household as the insured." The evidence showed that the insured, Phillip Hanna, was 20 years of age, and was in his third year as a student in Howard College in Birmingham, Alabama. During the summer vacation each year, Phillip returned to the home of his parents in East Tallassee, and also returned there for the Thanksgiving, Christmas, and Spring holidays. He also would return for weekend visits from time to time.

In construing the phrase "residing in the same household," the court said:

> The word 'residing' is an ambiguous, elastic, or relative term, and includes a very temporary, as well as a permanent, abode. *Phillips v. South Carolina Tax*

*Comm.*, 195 S.C. 472, 12 S.E.2d 13 [(1940)]. It means a dwelling place for the time being, as distinguished from a mere temporary locality of existence. *Drew v. Drew*, 37 Me. 389. It indicates some intent of permanency of occupation as distinguished from boarding or lodging, but does not require the intent of permanency to the degree required in domicile. 2 Kent's Comm. (19th Ed.) 576. While residence is a necessary component of domicile, residence is not always domicile. One may have a legal domicile with his family, and reside actually and personally away from his family. In such event the word 'reside' may correctly denote either the technical domicile, or the actual personal residence. The word 'reside' is often used to express a different meaning according to the subject matter. *In re Seidel*, 204 Minn. 357, 283 N.W. 742 [(1939)].

\* \* \* \* \* \*

Such visits (to the parents' home) were nothing more than mere temporary interruptions of his more permanent residence at Howard College. The same would apply to the Christmas and spring vacation periods. We doubt that such rule should apply to the long summer vacation period of several months where a student resumes living with his parents, nor should such rules apply where a student attends a college or university in the same town or city as his home while he continues to reside in his family home.

*Hanna, id.*

An exclusionary clause identical to Exclusion 2(c) was interpreted in *Larsen v. State Farm Mut. Auto Ins. Co.*, 485 So.2d 458 (Fla.App.1986). In that case appellant Larsen and her niece were involved in a one-car accident. The niece, a minor, had been living with appellant for two months. Appellant made a claim to her insurance company for coverage of the niece's medical expenses incurred as a result of the injuries she suffered.

Appellee State Farm denied coverage based upon the following Exclusion 2(C) in appellant's policy:

2. FOR ANY BODILY INJURY TO:

\* \* \* \* \* \*

c. ANY INSURED OR ANY MEMBER OF AN INSURED'S FAMILY RESIDING IN THE INSURED'S HOUSEHOLD.

Of this clause, the court said:

In short, the issue before us is the construction to be given the exclusion "any member of an insured's family residing in the insured's household." ... The insurer contends that the mentioned language is the standard "household exclusion" recognized in Florida. The company says that the exclusion applies not only to members of the immediate family but also to relatives who have become members of the insured's household. We agree with the company's position and recognize that often it will become a fact question as to whether a person has become integrated into the insured's household.

*Larsen, id.*

Nothing could be more obvious than that each such inquiry presents a fact question as to whether a person has "become integrated" into the insured's household. However, this begs the question. When is an adult child of an insured "integrated" or "reintegrated" into the insured's household?

The court, in *State Farm Mut. Auto. Ins. Co. v. Phillips*, 2 Wash.App. 169, 467 P.2d 189 (1970), gave the phrase a broad meaning. That court held that the son of an insured, while living at home, is a "member of the family of the insured residing in the same household," within the meaning of an insurance policy exclusionary clause, even though the son is also a full-time employee of his father, and entitled as an employee to the same board, room, and house privileges he enjoyed as a member of the family.

An Arkansas federal district court opinion authored by then District Judge J. Smith Henley, discussed similar policy language. *See State Farm Mut. Auto. Ins. Co. v. Pennington*, 215 F.Supp. 784 (E.D.

Ark.1963). In that case, Judge Henley wrote:

> When definitions of the words "family" and "household" contained in dictionaries and legal encyclopedias are examined, it is apparent at once that those words have no fixed or precise meaning. They may mean one thing in one context and something quite different in another context. The Court is concerned with their meaning as they appear in an exclusion clause contained in a policy of automobile insurance, which clause was inserted for the purpose of protecting the insurance company from liability collusively imposed. *Tomlyanovich v. Tomlyanovich*, 239 Minn. 250, 58 N.W.2d 855, 50 A.L. R.2d 108 [(1953)]; *State Farm Mutual Automobile Ins. Co. v. James*, 4 Cir., 80 F.2d 802 [(1936)].
>
> &ast; &ast; &ast; &ast; &ast; &ast;

Thus, Judge Henley conceded *arguendo* that the term "household" encompasses a broader field than the term "family." Yet, none of the myriad of cases touching this subject set forth an objective test as to when an adult child of an insured is a "member of an insured's family residing in the insured's household" or is "a person related to (the insured) ... who lives with (the insured)." It has been said that these terms are limited in scope to an aggregate of individuals related by ties of blood or marriage who share a common household, subject to the control of its head—a parent in the case of children—who are dependent on that head in whole or in part for their support. *See Henderson, id.*

■ However, under *any* definition the term "household" requires more than a "temporary visit" by the married, adult child of an insured, even a visit lasting several weeks. *See Williams, id.* Some courts have, in attempting to delineate the parameters of household exclusion clauses, looked to the underlying purpose of such clauses. *See Phillips, id.* It is said that such clauses are designed to protect the insurer from collusion, or an insured's tendency to enlarge the case against him, in intrafamily suits. *Phillips, id.; Henderson, id.* If so, the clauses must be limited in their proper reach only to those persons making a claim against the insured with whom the insured is likely to engage in collusion or enlarge the case against him. Of course, there may be some families whose distant relative would distort the truth for monetary gain and there are doubtless families wherein no member of the family would do so. Courts do not have to undertake a family-specific subjective analysis where there is agreement that the claimant is a family member or relative residing in the insured's household because it is reasonable to assume in those cases that the claimant stands in such a relationship to the insured that the insured and claimant will not be truly adversarial.

In those cases the physical proximity of the members as well as the financial, social, domestic, and emotional aspects of the relationships between the members is such that a truly adversarial posture between such persons is both unnatural and to a degree, sociologically undesirable. However, as the geographical and social bonds or the financial or emotional ties become altered or more attenuated, then at some point society is willing and able to recognize the *de facto* "separateness" of the persons or sub-units of "related" persons and it becomes objectively reasonable to anticipate some legitimate adversarial posturing. This is what makes all cases in the "grey area" fact-specific, as Judge Henley suggests.

Without attempting to formulate an all-encompassing and definitive interpretation of the phrases "relatives who live with" another person and "member of" another person's "family residing in" that person's "household," the court believes that the intention of the alleged "family member" or person allegedly "living with" the relative, is of primary importance, as well the actual and anticipated duration of the physical relocation, and any other factors bearing on the financial, domestic, and emotional integration of that person into a single micro-sociological unit.

■ In this regard the court notes that there is testimony to the effect that Jeanette never intended to return to her hus-

band and had *de facto* terminated geographical, emotional, sexual and economic ties with him. There is some evidence that Jeanette intended to continue to reside with her parents indefinitely and to become "reintegrated" into her parent's household unit.

On the other hand, there is countervailing testimony to the effect that Jeanette intended all along to shortly return to her husband and his abode, both physically, emotionally, and financially. Further, whether Jeanette intended to return to her husband within a brief time or not, there is evidence indicating that Jeanette refused to abide by the rules of her parents' house by seeing other men, staying out late, and using drugs or alcohol. This conduct, some evidence suggests, either caused Jeanette to make plans to leave her parents' house as soon as possible, or caused her parents to want her to do so. This evidence, if true, implies that Jeanette was not, and did not intend to become, "integrated" into her parent's family structure during the seven days she spent at her parent's address.

These factual contentions and conclusions to be drawn therefrom are all disputed by conflicting testimony and other inferences. These factual allegations are clearly "material" to this controversy. As such, summary judgment would be singularly inappropriate on this issue.

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.1987); Fed.R. Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Agristor Leasing v.*

*Farrow*, 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The Court has recently reviewed the burdens of the respective parties in connection with a summary judgment motion. In *Counts v. M.K.–Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, '[to] point[ ] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339, *quoting, City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir.1989) (*citing Trnka v. Elanco Products*, 709 F.2d 1223 (8th Cir.1983)).

Thus, the "household exclusion" issue cannot be resolved by summary judgment

on the current state of the record. The court will now address the other exclusionary argument advanced by State Farm.

As indicated, State Farm also contends that there is no coverage for liability claims made on behalf of Jeanette against William Jordan because she qualifies as a person injured "while using" the insured car within the scope of consent given by William Jordan or Marie Jordan. If this is the case, then Jeanette is an "insured" as defined on page 6 of the policy. If Jeanette is an "insured" then the policy does not cover her claims for bodily injury, because Exclusion 2(c) on page 7 of the policy specifically excludes coverage for bodily injury to "any insured." Thus, if Jeanette was "using" the car with consent, the policy provides no coverage for her claim against Jordan.

There are several cases interpreting the terms "use of" or "using" the insured vehicle by a passenger. An accident caused by a passenger unexpectedly grabbing the steering wheel of an automobile while the automobile was traveling 60 miles per hour was held by the court in *United States Fidelity & Guaranty Co. v. Hokanson,* 2 Kan.App.2d 580, 584 P.2d 1264 (1978), to have arisen out of the passenger's "use of" the automobile. The court stated that *coverage* clauses of automobile liability policies were to be interpreted broadly to afford the greatest possible protection to the insured. And, the court continued, "use" includes any exercise of control over the vehicle regardless of its purpose, extent, or duration. In the instant case, however, the broader the scope of the term "using," the broader the exclusion rather than coverage.

In a similar case where the owner of the insured automobile consented to give the plaintiff and a third passenger a ride home from a party, and, while driving to the plaintiff's home, the plaintiff interfered with the insured's operation of the vehicle, causing it to crash, the court in *Gronquist v. Transit Casualty Co.,* 105 N.J.Super. 363, 252 A.2d 232 (1969), held that the accident arose out of the passenger's "use of" the vehicle. The court further stated that although an ordinary meaning of the words would include a passenger while be-

ing driven to his home in an automobile, the intent was to cover only one who had possession of or directed or controlled the operation of the vehicle. The court added, however, that the substitution of the word "using" for earlier versions of insurance forms was intended to enlarge the scope of the coverage to include riding in the vehicle. *Gronquist,* too, was a *coverage* case rather than one defining the scope of an exclusion.

An oft-cited Arkansas case, *Hartford Fire Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 264 Ark. 743, 574 S.W.2d 265 (1978) is said to stand for the proposition that there must be a causal relation between an accident or injury and the "use" of the vehicle in order for the accident or injury to come within the meaning of the clause "arising out of the ... use" of a vehicle. Here, however, the clause at issue is "any other person while using" the insured vehicle. (policy, p. 6). The difference in the policy language in *Hartford* from that in the case at bar militates against applying *Hartford* to the instant action without qualification.

■ The cornerstone of contract interpretation, of course, is that it is the duty of courts to construe language used by the parties in an insurance contract by considering the sense and meaning of the terms the parties used as they are taken and understood in their plain, ordinary meaning. The terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing the policy so as to bind an insurer to a risk which is plainly excluded and for which it was not paid. *See Williams, id.* The term "use" was recently construed in *Baxley v. Colonial Insurance Co.,* 31 Ark. App. 235, 792 S.W.2d 355 (1990):

[T]he term 'use' as contained in the subject insurance policy should and must be interpreted in a common sense and practical way as expressed in *Hardware Mutual Casualty Co. v. Crafton* [233 Ark. 1020] 350 S.W.2d 506 [ (1961) ]. Further the Court finds that the term implies use with 'care, custody or control,' and 'with permission.' From the facts of the case

at bar, none of the foregoing requirements has been met.

\* \* \* \* \* \*

The above cases, we think, make it clear that the language 'any car ... you use ... if such use is with the permission of the owner' in the policy in the instant case must be considered 'with regard to the setting in which it is employed,' [*Great Am. Indem. Co. of New York v.*] *Saltzman* [213 F.2d 743 (8th Cir.1954)]; and 'is, to a large extent, dependent upon circumstances of each case.' *Crafton.* Thus, we think summary judgment was inappropriate in the instant case.

In the instant case, there is no evidence that Jeanette grabbed the steering wheel or in any manner exercised "control" of the vehicle. However, as has been seen, the term "use" in a *coverage* clause of an automobile policy is usually given broad general and comprehensive meaning and it includes any exercise of control over the vehicle, and according to some authorities extends to occupancy as a passenger. *See* 6B Appleman, *Insurance Law and Practice*, § 4316 (1979).[1] This is not necessarily the case when the terms are contained in an exclusionary clause.

However, certain policy language indicates that it would be error to equate "occupancy" with "use" in the *exclusionary* clause involved in this case. The court notes that although Jeanette was insured against liability if she caused bodily injury to a third person "while using" the insured vehicle (and that her claim for bodily injury against Jordan is arguably excluded for the same reason), Coverage C of the policy would have provided medical payment coverage if she sustained bodily injury while "occupying" the car. (policy, p. 8). The same is true for Coverage U, uninsured motorist coverage ("occupying," see policy, p. 10).

Therefore, one may easily conclude that State Farm itself intended the phrase "while using" the vehicle to mean something other than "occupying" the vehicle. Counsel for the plaintiff states that "the applicability of coverage (is) determined based upon whose purpose was being served at the time of the accident." (Plaintiff's Brief in Support of Motion for Summary Judgment, p. 9).

There is some support for this contention in *Dunlap v. Maryland Casualty Co.*, 242 Ark. 533, 414 S.W.2d 397 (1967). In that case, the court found that Glenn Gouge, Jr., a teen-ager, was permissively driving his father's car. At Sunday School he met some friends and invited them to ride around with him. The boy ran a stop sign and collided with a vehicle driven by Mr. Dunlap. In the collision, Dunlap's infant child received brain damage. Suit was filed on behalf of the infant child and against Glenn Gouge, Jr. Judgment was obtained for $19,959.25. Gouge, Sr. carried liability insurance in the sum of $10,000 and his insurer paid that amount.

One of the boys riding with Glenn Gouge, Jr., was Dan Smith. His father carried liability insurance with Maryland Casualty. When the case of *Dunlap v. Gouge* was filed, Maryland was notified of the filing. Maryland was advised by Dunlap's counsel that in his opinion Maryland's policy issued to the Smith family covered this accident. Maryland declined to participate. The mother of the injured child filed suit to compel payment by Maryland Casualty. Counsel for appellant Dunlap advanced a unique theory upon which Dunlap's claim for recovery from Maryland was predicated. It was contended that Dan Smith's act of riding in the Gouge automobile constituted a "use" (by Dan) of a non-owned automobile. Maryland's policy covering the Smith family referred to coverage with respect to the "use" of a

---

**1.** Even if Jeanette's claim for bodily injury against Jordan is not covered because she was killed "while using" the insured vehicle, Arkansas law requires uninsured motorist coverage for the user of an insured vehicle who is insured against liability. Although the uninsured motorist policy would not apply to claims by Jeanette against Jordan (see policy, p. 10), the uninsured motorist policy at issue would cover any liability claims Jeanette may have against uninsured third-parties, if there are any. *See First Security Bank v. Doe*, 297 Ark. 254, 760 S.W.2d 863 (1988); Ark.Code Ann. § 23–89–403(a).

non-owned automobile. It was Dunlap's theory that under this "use coverage" Maryland was liable.

Dunlap argued that under the provisions of the Smith policy, Glenn Gouge, Jr. was an insured because Gouge was a "third person legally responsible for using a non-owned automobile which was also being 'used' at the same time by the Smiths or a relative."

In rejecting this contention the Arkansas Supreme Court said:

> The pivotal question is: Was Dan Smith using the Gouge automobile? There is no allegation of joint venture between the teen-agers riding in the Gouge automobile. There is no proof that Dan Smith participated, directly or indirectly, in the operation of the Gouge car.

> \*    \*    \*    \*    \*    \*

> There are many cases which discuss the subject of "use" as the word is utilized in liability policies. It is the opinion of this court that no reasonable person could thusly construe the language of the policy; to do so would, in effect, extend its coverage to any situation wherein the insured is the occupant of an automobile. Clearly this is neither the intended nor apparent meaning of the policy.

With these principles in mind, the court will briefly analyze the evidence.

■ State Farm urges that because William Jordan and Jeanette were returning home at the time of the accident, after delivering Jeanette's children to their paternal grandparents for the weekend, "it is clear that the Jordan pickup truck was being 'used' by Jeanette Hollingsworth to transport her children.... This was the only purpose for this trip and did not benefit William Jordan individually."

Marie Jordan, however, testified that William Jordan was accommodating the paternal grandparents' request to visit with the grandchildren. The primary "beneficiaries" of such a trip would appear to be the grandchildren and the paternal grandparents, the Hollingsworths. The only evidence before the court reflects that William Jordan was unaware of his married daughter's scheduled "date" with Steve Sharp later that evening, and obviously he could not have acted for the purpose of facilitating that "date" if he was unaware of it.

It may well be the case that Jeanette wished to have the Hollingsworths care for the children for the weekend in order that she could go out on her "date." It could also be the case that the Hollingsworth's desire to visit with the children solely motivated the trip. Possibly William Jordan equally desired such a weekend arrangement merely for the sake of obtaining peace and quiet away from the children to whom he may have been unaccustomed. It might have been entirely Mr. Jordan's idea that he drive the children to the Hollingsworths and he may have asked Jeanette to "tag along" for companionship. Or it could be Jeanette requested Mr. Jordan to drive the pickup because of the poor weather. We simply cannot resolve these factual issues.

Because Jeanette presumably could have driven the children to the Hollinsworths without Mr. Jordan, and *vice versa*, there is room for the possibility that the only true "beneficiaries" of the trip were the children and the Hollingsworths. It is possible that Jeanette's presence in the vehicle was incidental, fortuitous, or a pleasant accommodation to Mr. Jordan. Whether the fateful trip was a joint venture or one in which Jeanette participated directly or indirectly in the operation of the vehicle, *see Dunlap*, is unknown. Whether Jeanette exercised any control, *see Hokanson; Baxley*, derived the primary benefit of the trip, or motivated the excursion is similarly unknown.

For reasons indicated, the court believes that something more than "occupancy" must be shown to establish "use." That "something more" has not been produced with sufficient clarity as to justify summary relief on this issue.

### III. *Conclusion*

■ State Farm seeks a declaration that it has no duty to defend Jordan or his estate in the tort lawsuit by Jeanette's administrator, and further that there is no

1366

coverage. Because of the material issues of fact set forth above remaining in this litigation, the court cannot decide the coverage question. The duty to defend, however, is a different issue. The duty to defend is broader than the duty to pay damages and cannot always be determined by reference to the complaint. *See Smith v. St. Paul Guardian Ins. Co.*, 622 F.Supp. 867 (W.D.Ark.1985), 54 U.S.L.W. 2343. The duty to defend arises "where there is a possibility that the injury or damage may fall within the policy coverage." *Commercial Union Ins. Co. v. Henshall*, 262 Ark. 117, 553 S.W.2d 274 (1977).

The court concludes that there is a possibility that the injury sustained by Jeanette Hollingsworth is covered under the terms of the policy issued by State Farm to William Jordan. Therefore, since that is true, the court cannot grant plaintiff's summary judgment motion finding that there is no duty to defend Jordan's estate in the underlying tort claim by Jeanette Hollingsworth. The coverage question "must be postponed until after the facts are developed at trial of the personal injury action." *Henshall*, 262 Ark. at 124, 553 S.W.2d 274.

Plaintiff's motion for summary judgment will be denied by separate order. This case will be administratively terminated until after the conclusion of the tort litigation and will be reopened upon request by the parties for any lawful purpose.