**HANOVER AMERICAN INSURANCE COMPANY, on behalf of all others similarly situated, Plaintiff–Appellee,**

and

**NCMIC Insurance Company, Third–Party Defendant–Appellee,**

v.

**Debora K. BALFOUR; Dr. Debora K. Balfour Chiropractic, P.C., Defendants Third–Party Plaintiffs–Appellants,**

and

**Gregory A. Saul; Matthew A. Briner, individually and as next friend of his minor daughter A.A., Defendants.**

No. 13–6226.

United States Court of Appeals, Tenth Circuit.

Jan. 21, 2015.

Sherry L. Smith, Mort G. Welch, Welch & Smith, P.C., for Plaintiff–Appellee.

Brett Edward Gray, Randall Jay Lewin, Philip Raymond Richards, Richards & Connor, Tulsa, OK, for Third–Party Defendant–Appellee.

George H. Brown, Tony Gould, Brandon D. Kemp, Brown & Gould, Oklahoma City, OK, for Defendants Third–Party Plaintiffs–Appellants.

William L. Ford, Branch & Hurtt Law Firm, Norman, OK, for Defendant.

Before KELLY, LUCERO, and HARTZ, Circuit Judges.

### ORDER AND JUDGMENT*

KELLY, Circuit Judge.

Defendants/Third–Party Plaintiffs/Appellants Debora K. Balfour and Dr. Debora K. Balfour Chiropractic, P.C. appeal from the district court's orders dismissing claims against Third–Party Defendant–Ap-

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

pellee NCMIC Insurance Company and granting declaratory judgment in favor of Plaintiff–Appellee Hanover American Insurance Company. Essentially, the district court held that the policies did not provide coverage and, therefore, neither insurer had a duty to defend. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

Appellant Debora K. Balfour is a licensed chiropractor who owns her own practice in Oklahoma City. Her practice, Debora K. Balfour Chiropractic, P.C. ("DKBC" or "the DKBC clinic"), is located in an office building at 8501 South Penn Avenue in Oklahoma City ("the 8501 building"). Dr. Balfour, either individually or through a limited liability company organized by her, owns both the 8501 building and another office building located at 8505 South Penn Avenue ("the 8505 building").

In February 2012, Dr. Balfour's ex-husband, Gregory A. Saul, was charged in Cleveland County, Oklahoma, with multiple counts of raping A.A., a female minor. Aplt.App. 547. The criminal information charged Saul with committing several acts of rape and forcible oral sodomy during 2011 and 2012, when A.A. was 13 and 14 years old, respectively. *Id.* 547–48. Significant for our purposes here, A.A. testified at a preliminary hearing that, in addition to being assaulted by Saul at the Christian school she attended (where Saul was her teacher) and at Saul's house, she was also assaulted in the 8501 building at the DKBC clinic. *Id.* 596.

Following the criminal charges, A.A.'s guardian (on behalf of himself and as next friend of A.A.) filed a lawsuit in Oklahoma state court asserting multiple causes of action stemming from the sexual assaults ("the Briner lawsuit"). *Id.* 41–47. In addition to Saul and Saul's employer, Dr.

Balfour and DKBC were named as defendants. According to the complaint, Saul had referred A.A. to the DKBC clinic, where she became one of Dr. Balfour's patients. *Id.* 45. The Briner lawsuit alleges that Dr. Balfour "was aware [Saul] had a history and propensity to sexually molest under age females but failed to warn her patient A.A.," and, further, that Dr. Balfour "allowed ... Saul unfettered access to the building occupied by [DKBC]." *Id.* In essence, the claims asserted against Dr. Balfour and DKBC are based on Dr. Balfour's negligence in (1) failing to warn A.A. about her ex-husband's propensities and (2) allowing Saul access to the 8501 building. The complaint concludes that Dr. Balfour's "negligence and substandard care" facilitated Saul's sexual offenses and caused A.A. "to suffer physical and mental pain, and immediate and future medical expense." *Id.* 45–46.

Dr. Balfour has two insurance policies related to her business: a professional liability policy for chiropractic malpractice through NCMIC Insurance Co. ("NCMIC") and a "businessowners'" policy through Hanover American Insurance Co. ("Hanover"). Dr. Balfour tendered the defense of the Briner lawsuit to both insurers and requested that they indemnify her for any damages. Hanover provided a defense with a reservation of rights. NCMIC shared the cost of the defense with Hanover, but did so subject to its own reservation of rights. NCMIC thereafter determined that its policy provided no coverage for the claims asserted in the Briner suit, and asked Dr. Balfour to consent to its withdrawal.

Contending that it had no obligation to defend or indemnify Dr. Balfour in the Briner lawsuit, Hanover filed this declaratory judgment action. *Id.* 12–24. Dr. Balfour counterclaimed seeking both an

opposite declaratory judgment and a mandatory injunction directing Hanover to provide her with counsel of her choice. *Id.* 160–73. With her answer, Dr. Balfour filed a third-party complaint against NCMIC seeking a declaratory judgment that NCMIC has an obligation to defend and indemnify her in the Briner lawsuit. The third-party complaint also asserted claims of bad faith and breach of contract. NCMIC responded by filing a motion for judgment on the pleadings or, alternatively, a motion to dismiss. *Id.* 338–53. Hanover filed a motion for summary judgment. *Id.* 408–11.

Treating NCMIC's motion as a motion to dismiss under Rule 12(b)(6), the district court concluded that NCMIC had no contractual obligation to defend or indemnify Dr. Balfour in the Briner suit. *Hanover Am. Ins. Co. v. Saul,* No. CIV–12–0922–HE, 2013 WL 812353 (W.D.Okla. Mar. 5, 2013). The court determined that any violation by Dr. Balfour was not a violation of her duty as a chiropractor and, therefore, was not covered by the professional liability policy issued by NCMIC. The court therefore dismissed all of Balfour's claims against NCMIC.

The district court also granted summary judgment to Hanover on its declaratory judgment claim. *Hanover Am. Ins. Co. v. Saul,* No. CIV–12–0922–HE, 2013 WL 4542284 (W.D.Okla. Aug. 27, 2013). The district court held that there was no coverage under the Hanover policy because (1) the claims asserted in the Briner lawsuit did not arise out of Dr. Balfour's "business" and (2) those claims did not allege an injury arising out of an "offense" of "humiliation."

Dr. Balfour now appeals the district court's determinations that neither NCMIC nor Hanover had a duty to defend her.[1] Aplt. Br. 2.

## Discussion

### A. Insurer's Duty to Defend Under Oklahoma Law

The parties do not dispute that Oklahoma insurance law governs the issues raised in this case. Under Oklahoma law, "[t]he duty to defend is separate from, and broader than, the duty to indemnify, but the insurer's obligation is not unlimited." *First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.,* 928 P.2d 298, 303 (Okla. 1996). The duty to defend is triggered whenever the insurer "ascertains the presence of facts that give rise to the *potential of liability* under the policy." *Id.* (emphasis in original). This determination is made by looking to information "gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded." *Id.* While the insurer "has the duty to look behind the third party's allegations to analyze whether coverage is possible," *id.* n. 15, the burden is on the insured to show that the claim is covered by the policy. *Boggs v. Great N. Ins. Co.,* 659 F.Supp.2d 1199, 1204 (N.D.Okla.2009).

The parties dispute whether the allegations and other information available to the insurers were sufficient to trigger the duty to defend. We interpret insurance contracts "in accordance with principles applicable to all contracts." *Mansur v. PFL Life Ins. Co.,* 589 F.3d 1315, 1319 (10th Cir.2009); *Turley,* 928 P.2d at 303 n. 8. The terms of a contract are construed according to their plain meaning and any ambiguities will be "construed liberally in

---

1. DKBC is not before this court as a party on appeal. Counsel for Dr. Balfour and DKBC concedes that DKBC did not respond to Hanover's motion for summary judgment in the district court and, therefore, cannot now appeal from that judgment. Aplt. Rep. Br. 2.

favor of an insured and strictly against the insurer." *Cont'l Cas. Co. v. Beaty*, 455 P.2d 684, 688 (Okla.1969). However, "[a] court should not create an ambiguity in the policy by 'using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision.'" *Boggs*, 659 F.Supp.2d at 1205 (quoting *Wynn v. Avemco Ins. Co.*, 963 P.2d 572, 575 (Okla.1998)). Further, a mere "split in authority over whether a certain term is ambiguous" is insufficient to create an ambiguity, and Oklahoma courts "will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered." *Boggs*, 659 F.Supp.2d at 1205 (internal quotation marks omitted) (citing *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835–36 (Okla. 2005)).

### B. *The NCMIC Policy*

The district court concluded that NCMIC's professional liability policy does not provide coverage for the claims asserted in the Briner suit. Dr. Balfour argues that this conclusion amounts to legal error because there is a "possibility" of coverage sufficient to trigger NCMIC's duty to defend. Her argument rests upon the contention that her alleged negligence occurred during the provision of "professional services." Reviewing the district court's grant of dismissal de novo, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.2009), we affirm.

Dr. Balfour's policy with NCMIC is styled as a "professional liability" policy for "chiropractic malpractice." Aplt.App. 307. Under the terms of the policy, NCMIC must pay "all sums to which this insurance applies and for which an **insured** becomes legally obligated to pay as **damages** because of an **injury**." *Id.* 319. NCMIC's duty to defend and indemnify is

limited, however, to suits alleging an injury "caused by an accident arising from an **incident**." *Id.* "Incident" is specifically defined as "any negligent omission, act or error in the providing of **professional services** by an insured." *Id.* 318. The policy defines "professional services" as those "services which are within the scope of practice of a chiropractor in the state or states in which the chiropractor is licensed." *Id.*

The policy contains several exclusions. The policy excludes from coverage claims arising out of (1) acts or omissions that violate state or federal statutes; (2) "sexual impropriety, sexual intimacy, [or] sexual assault;" or (3) "intentional infliction of injury." *Id.* 321.

■ Whether NCMIC has a duty to defend Dr. Balfour under the policy centers on two basic questions. The first is whether Dr. Balfour's alleged acts or omissions—failing to warn A.A. about Saul and allowing Saul access to the 8501 building—constitute services within the scope of chiropractic practice in Oklahoma, i.e. whether they are "professional services" under the policy. If this question is answered in the affirmative, we must then ask whether those acts or omissions are excluded from coverage by one of the policy's exclusions. Because the district court correctly held that Dr. Balfour's acts (or omissions) were not "professional services," we need not consider whether one of the policy's several exclusions applies.

Dr. Balfour contends that any alleged negligence occurred during the provision of her "professional services." Dr. Balfour makes two arguments to support this contention: (1) in Oklahoma, maintaining proper "office management procedures" is part of a chiropractor's *professional* duty; and (2) the Oklahoma courts could find that Dr. Balfour breached a professional duty by failing to warn a patient of her ex-

husband's propensity to sexually assault minor females. Under Dr. Balfour's theory, the validity of either of these arguments would give rise to the "possibility" that coverage exists. We address these arguments in turn.

NCMIC's duty to defend is triggered only if the injuries alleged in the Briner complaint were the result of the provision of "professional services." In the absence of Oklahoma case law controlling the question before us, Dr. Balfour points to Oklahoma statutes and regulations to support her contention that maintaining proper office management procedures is part of a chiropractor's professional duty. The Oklahoma Chiropractic Practice Act defines the scope of chiropractic practice as "those diagnostic and treatment services and procedures which have been taught by an accredited chiropractic college and have been approved by the Board of Chiropractic Examiners." Okla. Stat. Ann. tit. 59, § 161.2. Additionally, Dr. Balfour points out that the Oklahoma Administrative Code requires newly licensed chiropractors to complete an orientation course that includes "no less than eight (8) hours of office management procedures and new doctor orientation." Okla. Admin. Code § 140:10-3-6(d).

These statutes and regulations do not support the claim that the functions of managing and maintaining a business office are "professional services" within the scope of Dr. Balfour's chiropractic malpractice insurance policy. First and foremost, the statutory language cited by Dr. Balfour undercuts her contention, rather than providing support for it. To include all facets of office administration—from billing, to maintenance, and security—under the umbrella of *diagnostic and treatment services and procedures* would be to ignore the plain and common usage of the terms "diagnostic" and "treatment."

Moreover, courts in analogous contexts have limited the meaning of "professional services" to those acts or services "arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual rather than physical or manual." *Shelter Ins. Co. v. Hildreth,* 255 F.3d 921, 925 (8th Cir.2001) (internal quotations omitted); *see Mut. Assurance Adm'rs Inc. v. U.S. Risk Underwriters, Inc.,* 993 P.2d 795, 797–98 (Okla.Civ.App.Div.1999) (citing *Gulf Ins. Co. v. Gold Cross Ambulance Serv. Co.,* 327 F.Supp. 149, 152 (W.D.Okla. 1971)). Third, the broad reading offered by Dr. Balfour would be contrary to the reasonable expectations of the parties when they entered into the contract, and would transform a medical malpractice policy into a general commercial liability policy—an undertaking we are not willing to assume. Finally, we find unpersuasive Dr. Balfour's attempt to argue that any topic or material covered in a state-mandated orientation program becomes a component of the "professional services" rendered in that profession.

Dr. Balfour next argues that the Oklahoma courts could find that "a duty to warn or a duty to safeguard clinic property could be considered concomitant duties with the scope of practice of a chiropractor." Aplt. Br. 15. Dr. Balfour notes that the "existence of a legal duty is a fact-intensive inquiry made on a case-by-case basis" in Oklahoma. *Id.* According to Dr. Balfour, in the underlying negligence action against her, an Oklahoma court could find that her acts or omissions violated a professional—as opposed to some other—duty and, therefore, those acts or omissions would fall within the meaning of "professional services" as defined by Oklahoma law. We are not persuaded.

First, we agree with the district court that, while Balfour's acts and omissions may have violated *some* duty, it was not a violation of a professional chiropractic duty that Dr. Balfour owed A.A. *Hanover*, 2013 WL 812353, at *4. Dr. Balfour cites no authority from Oklahoma or any other jurisdiction to suggest that a chiropractor owes her patients a professional duty to warn them about known sexual predators who are in no way involved in their diagnosis or treatment.[2] Second, "[t]he duty to defend relates to coverage, which is a matter of contract interpretation as it relates to a set of facts, *and not liability*." *Turley*, 928 P.2d at 303 n. 8 (emphasis added) (internal quotation marks omitted). In considering whether NCMIC must defend Dr. Balfour, the task is to interpret the meaning of "professional services" in the policy. As noted above, we believe that phrase is clearly defined by both the policy and the relevant statute. We find no occasion to theorize whether an .Oklahoma court, at some point in the future, will find that a chiropractor has a professional duty to warn patients about her ex-husband's sexual propensities.

Accordingly, we conclude that Dr. Balfour's alleged acts or omissions were not committed during the provision of "professional services" as defined by the policy and therefore are not covered by the NCMIC policy.

## C. *The Hanover Policy*

Dr. Balfour similarly argues that her general liability insurer, Hanover, has a duty to defend her in the Briner suit. The district court held that the Hanover policy did not provide coverage because (a) A.A.'s injuries did not arise out of Balfour's "business," as required by the policy, and (b) the claims were not based on an offense of "humiliation," and therefore could not constitute "personal and advertising injury" under the policy. We review the district court's grant of summary judgment de novo. *Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir.2003). While we conclude that A.A.'s injuries *did* arise out of Dr. Balfour's business, we agree with the district court that Hanover has no duty to defend because there is no "personal and advertising injury" under the policy.

On December 12, 2010, Hanover provided Dr. Balfour with a renewal of her "businessowners' " insurance policy, effective February 14, 2011. Aplt.App. 49. The "business type" is listed as "partnership," and both Dr. Balfour and Saul are named as insured parties.[3] *Id.* 58. Significant for our purposes, the declarations page provides that the "business of the named insured[s]" is "office." Both the 8501 and the 8505 buildings are covered premises. *Id.* The policy also includes a General Liability Broadening Endorsement for a "chiropractors office." *Id.* 59.

**2.** As noted, Saul was a Christian school teacher at a school where A.A. was his student. Aplt.App. 43–44. We note this simply to acknowledge the fact that Saul's offenses against A.A. did not apparently depend on, or revolve around, A.A.'s status as a patient at the DKBC clinic.

**3.** Hanover argued in the district court that neither Dr. Balfour nor DKBC were insured under the policy. The only insured party, Hanover argued, was the Gregory and Debora

Saul D.C. partnership, a non-existent business entity. Hanover's argument relied on the fact that the policy designates the business type as a "partnership" and lists "Gregory & Debora Saul D.C." as the named insureds. Hanover has abandoned this argument on appeal. Hanover Br. 14.

We also note the Dr. Balfour is identified by the policy as "Debora Saul D.C.," which she represented to the district court is her legal name.

The policy contains two general coverage sections: Section I covers property damage and Section II covers business liability and medical expenses. *Id.* 60. Specifically excluded from coverage under Section II are injuries resulting from the provision of professional services. *Id.* 112.

We are concerned here only with Section II of the policy. Under the "business liability" portion of Section II, Hanover is obligated to defend and indemnify Dr. Balfour in suits seeking damages for three general types of injuries: "bodily injury," "property damage," and "personal and advertising injury." *Id.* 106. The sole category of injury at issue here is "personal and advertising injury."[4]

The policy provides coverage for " 'personal and advertising injury' caused by an offense arising out of your business." *Id.* 107. "Personal and advertising injury" is thereafter defined by the policy as:

[I]njury, including consequential "bodily injury," arising out of one or more of the following *offenses:*

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement;" or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement;" [or]

h. *Discrimination or humiliation* (unless insurance thereof is prohibited by law) that results in injury to the feelings or reputation of a natural person, but only if such discrimination or humiliation is:

(1) Not done intentionally by or at the direction of:

(a) The insured; or

(b) Any officer of the corporation, director, stockholder, partner or member of the insured; and

(2) Not directly or indirectly related to an "employee," nor to the employment, prospective employment or termination of any person or persons by an insured.

*Id.* 121–22, 137 (emphasis added).[5]

To determine whether Hanover has a duty to defend Dr. Balfour in the Briner lawsuit, we must determine: (1) whether there was an injury arising out of Dr. Balfour's "business"; and (2) whether that injury arose out of an "offense" of "humiliation." We consider those questions in turn.

---

4. As the district court noted, Dr. Balfour "does not contest Hanover's assertion that the policy does not provide coverage for any bodily injuries A.A. suffered." *Hanover,* 2013 WL 4542284, at *5 n. 11. Dr. Balfour relies solely on the "personal and advertising injury" provision of the Hanover policy as the basis for Hanover's duty to defend her.

5. The original definition of "personal and advertising injury" did not include clause "h," which covers injuries arising out of an offense of "discrimination or humiliation." *See* Aplt. App. 121. This clause was later added by a special broadening endorsement. *See id.* 135–39.

1. *Whether the injury arose out of Balfour's "business"*

■ Answering the first of these questions requires us to engage in a two-step inquiry. First, we must determine what Balfour's "business" is. Second, we must determine whether the alleged injury "arises out of" that business.

The district court concluded that the only relevant "business" at issue was Dr. Balfour's chiropractic business.[6] *Hanover,* 2013 WL 4542284, at *5. And because none of the conduct giving rise to the Briner suit was related to the "business" of running a chiropractic clinic, the district court reasoned, Dr. Balfour could not establish that A.A.'s injuries arose out of that business. *Id.*

Dr. Balfour argues that the district court focused too narrowly on the chiropractic practice for the purpose of this inquiry. Instead, Dr. Balfour argues, "[t]he policy, by its own terms, clearly provides coverage for [Dr.] Balfour's capacity as owner and manager of office buildings." Aplt. Br. 21. We agree. The policy specifically describes the "business of the named insured" as "office," rather than "chiropractor's office," "chiropractic practice," or even "doctor's office." Aplt. App. 58. Thereafter, on the very next page, there is an acknowledgment of a general liability broadening endorsement for a "chiropractor[']s office." *Id.* 59. The use of the more specific term "chiropractor's office" suggests that the drafter of the policy knew how to differentiate be-

tween general and specific terms. *See Weight Loss Healthcare Ctrs. of Am., Inc. v. Office of Pers. Mgmt.,* 655 F.3d 1202, 1210 (10th Cir.2011) ("When the drafters so clearly knew how to express one meaning, their failure to do so implies that the meaning was not intended. Here, that argument is particularly compelling because ... the drafters.... could have used the method of expression employed in either the preceding or succeeding paragraph."). Additionally, the policy provides liability insurance for both the 8501 building—where the DKBC clinic is located— *and* the 8505 building, which Dr. Balfour leased to third-parties. If the policy applied only to a chiropractic practice, as the district court concluded, coverage for the 8505 building would be illusory. Thus, we find that the relevant "business" is Balfour's ownership and operation of two office buildings.

We next consider whether A.A.'s alleged injuries arise out of Dr. Balfour's ownership and operation of the business properties. Oklahoma courts generally interpret the phrase "arising out of" broadly to mean "originating from," "flowing from," "growing out of," or "done in connection with." *Fed. Ins. Co. v. Tri–State Ins. Co.,* 157 F.3d 800, 804 (10th Cir.1998) (applying Oklahoma law); *see Ply v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 81 P.3d 643, 649 (Okla.2003) (describing the phrase as "broad, general and comprehensive"). The phrase simply "requires some causal connection to the injuries suffered, but

---

**6.** According to Hanover, Dr. Balfour's representation to the district court that the Hanover policy provided coverage for her "in her capacity as the sole proprietor of the chiropractic office," invited the court to determine that the relevant "business" was the chiropractic practice. Hanover Br. 17. Hanover argues that Dr. Balfour cannot attack this finding because of the "invited error" doctrine. *Id.* 18. We disagree. Dr. Balfour's

representation that she was insured under the Hanover policy in her individual capacity was merely responding to Hanover's (now abandoned) contention that the policy only provided coverage for the Gregory and Debora Saul D.C. "partnership." Dr. Balfour is not now seeking reversal of some action that was induced by her argument below. *See United States v. Edward J.,* 224 F.3d 1216, 1222 (10th Cir.2000).

does not require proximate cause in the legal sense." *Tri–State Ins. Co.*, 157 F.3d at 804.

Hanover argues that the causal connection between Dr. Balfour's business and Saul's sexual assault of A.A. is insufficient to meet this standard. In support of this argument, Hanover cites a plethora of cases holding that "sexual crimes do not arise out of the use of a motor vehicle or an insured premises, if the vehicle or premises was merely the situs of the criminal conduct." Hanover Br. 19 (citing *Peters v. Firemen's Ins. Co.*, 67 Cal.App.4th 808, 79 Cal.Rptr.2d 326 (1998); *Mayer v. State Farm Mut. Auto. Ins. Co.*, 944 P.2d 288, 290 (Okla.1997); *Reznichek v. Grall*, 150 Wis.2d 752, 442 N.W.2d 545 (Ct.App. 1989)). One such example cited by Hanover is *Kramer v. State Farm Fire & Cas. Co.*, 76 Cal.App.4th 332, 90 Cal.Rptr.2d 301 (1999). In *Kramer,* a grandfather had apparently molested several of his grandchildren on various properties that he owned or rented. When he and his wife were sued, the grandparents tendered the defense to State Farm, with whom they held three insurance policies. State Farm refused to defend the insureds on the two renters policies; State Farm argued that the molestations did not "arise out of the ownership, maintenance, or use of" the insured properties, as required by the policies. *Id.* at 304. After reviewing a number of insurance cases dealing with the "arising out of" requirement, the court held that:

> The molestations thus could, and in fact would, have occurred even if the Kramers had not owned, maintained, or used the [rental] premises. The circumstances from which the injuries arose were Mr. Kramer's propensity toward child molestation and his and Mrs. Kramer's suppression of the molesta-

tions, not the use of any particular location for the care of the children.

*Id.* at 307.

While *Kramer* and the other authorities cited by Hanover are instructive, they are factually and legally distinguishable. We first note that other California cases cited in *Kramer* endorse a broader reading of the term "arising out of" in the insurance context. *See Feurzeig v. Ins. Co. of the West,* 59 Cal.App.4th 1276, 69 Cal.Rptr.2d 629, 633 (1997); *see also State Farm Mut. Auto. Ins. Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123, 127 (1973) ("[T]his language of 'arising out of the use' ... has broad and comprehensive application, and *affords coverage for injuries bearing almost [a]ny causal relation* with the [insured property].") (emphasis added).

More importantly, there is a critical distinction between the residential rental policies at issue in *Kramer* (and the motor vehicle policies cited) and the business liability coverage in this case. It is well established under Oklahoma law that businessowners who hold their property open to the public owe a higher duty to invitees on their land than do homeowners with respect to social guests. *See Pickens v. Tulsa Metro. Ministry,* 951 P.2d 1079, 1083–84 (Okla.1997). Additionally, commercial landowners may be held liable for failing to maintain adequate security, especially in the face of *known* risks (as the Briner complaint alleges Saul was). *See Bray v. St. John Health Sys. Inc.,* 187 P.3d 721, 724 (Okla.2008); *Lewis v. Wal–Mart Stores E., L.P.,* 225 P.3d 6, 10 (Okla.Civ. App.Div.2009). Plainly, then, a person who owns and operates office buildings as a business has a duty to provide adequate security measures. Failing to provide such measures is conduct that arises out of that business.

### 2. Whether the Briner lawsuit alleges an offense of "humiliation"

█ We next address the requirement that the claims and allegations asserted against Dr. Balfour must arise out of an "offense" of "humiliation." As noted above, the Hanover policy defines "personal and advertising injury" as an "injury ... arising out of one or more of the following offenses." The policy then enumerates various "offenses." Notably, each of the listed offenses is either a tort or other distinct cause of action with the sole exception of "humiliation." With this structure and content in mind, the district court concluded that, because Dr. Balfour was sued for negligence, as opposed to humiliation, she was not sued for a covered offense.

Dr. Balfour counters that she is entitled to a defense because she is being sued for an offense of humiliation. Dr. Balfour's argument can be broken down into three sub-arguments. First, "the underlying rape claim is a humiliation offense and a humiliation injury." Aplt. Rep. Br. 3–4. In essence, she argues that A.A. is suing Dr. Balfour on the rape claim, which is an offense of humiliation. Second, Dr. Balfour argues that under Oklahoma law an insurer must look beyond the pleadings—beyond the actual *claims* asserted—to the underlying factual allegations to determine whether the duty to defend has been triggered. Aplt. Br. 28–30. Thus, even if the *claims* in the Briner lawsuit sound in negligence, those claims are predicated upon factual allegations of humiliating conduct. She points out that if the court construes the list of "offenses" as only including torts and other distinct causes of action (of which "humiliation" is neither) then the word "humiliation" would be rendered meaningless. Third, Dr. Balfour contends that any ambiguity in the word "humilia-

tion" must be construed broadly in her favor.

In *Liberty Mutual Insurance Co. v. East Central Electric Cooperative*, 97 F.3d 383, 389 (10th Cir.1996), we addressed an insurance term that "had not previously been interpreted under Oklahoma law." We looked for "the best-reasoned interpretation" to apply, just as the Oklahoma Supreme Court would. *Id.* The first task was to determine if the term was ambiguous. *Id.* at 390. Concluding that the term was not ambiguous, the court relied on both (a) interpretations given to the phrase by courts in other jurisdictions, and (b) a familiar canon of construction (there, *ejusdem generis*). *Id.* (citing *State ex rel. Comm'rs of the Land Office v. Butler*, 753 P.2d 1334, 1336 (Okla.1987)) ("The rules of interpretation of contract, ... such [as] ejusdem generis, are for use by the court to determine whether an ambiguity exists."). Using similar aides, we conclude that Dr. Balfour's arguments are not supported by a natural reading of the policy.

We begin with the contention that the word "humiliation" is ambiguous. If such a contention is true, we must construe the term broadly in Dr. Balfour's favor. As a threshold matter, the word "humiliation" is rarely, if ever, used in common parlance to describe the *act* of a sexual assault. While the words "humiliation" and "humiliating" may often be used to describe the *effects* of such conduct, people normally refer to rape, molestation, and other acts of sexual assault by their common names. That said, we reject Dr. Balfour's attempt to "create an ambiguity in the policy by using a forced or strained construction, *by taking a provision out of context,* or by narrowly focusing on a provision." *Boggs,* 659 F.Supp.2d at 1205 (emphasis added) (internal quotations and citations omitted). Merely because the parties disagree as to the proper meaning of the term and courts

have given the term differing interpretations does not mean that the term is ambiguous. *Id.*

As the law instructs, we look at the word "humiliation" not in a vacuum, but in context. *See Dodson v. St. Paul Ins. Co.,* 812 P.2d 372, 376 (Okla.1991). Under the legal maxim *noscitur a sociis,* "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." *Sullins v. Am. Med. Response of Okla., Inc.,* 23 P.3d 259, 263 (Okla.2001). And while the canon of *ejusdem generis* is not strictly applicable in this case, its basic premise is informative in discerning the meaning of "humiliation." *See Liberty Mutual,* 97 F.3d at 390 ("The principle of ejusdem generis suggests that when interpreting a general word that follows a series of specific words, those specific words restrict the meaning of the general.") (internal quotations omitted). As noted, each of the "offenses" included in "personal and advertising injury" is either a tort or some other specific cause of action. In light of this, it would be a "forced or strained" construction to read "humiliation" as a general, catch-all term that includes any and all conduct one might consider "humiliating." Further, it seems highly unlikely that the parties to the contract intended the term "humiliation" to include negligence causes of action when the word "negligence" is conspicuously omitted from a list of recognized torts. While we must construe any ambiguities in Dr. Balfour's favor, it is not our task to strain the natural language of a contract provision in order to find coverage.

Hanover and Dr. Balfour each cite authorities from other jurisdictions that have interpreted similar, if not identical, language in insurance contracts. We find the

cases cited by Hanover to be better reasoned and, therefore, more persuasive.

At issue in each of these cases were insurance policies that provided coverage for damages arising out of the offense of humiliation. Similar to this case, the third-party suit in each of these cases sought damages for humiliation or embarrassment. But, like here, the theory of recovery asserted by the third-party plaintiff was something other than humiliation. For example, in *Innovay, Inc. v. Hartford Casualty Insurance Co.,* No. B215357, 2010 WL 2978632 (Cal.Ct.App. July 30, 2010) (unpublished), the third-party complaint asserted that the plaintiff suffered emotional harm and was "embarrassed among his friends and business associates." *Id.* at *5. The theories of recovery, however, were fraud, deceit, and negligent misrepresentation. *Id.* at *1. There, the court rejected the insured's argument that it was entitled to a defense under the "personal and advertising injury" provision of its policy, which provided coverage for injuries arising out of the offense of "[d]iscrimination or humiliation." *Id.* at *2. The court held:

> We also disagree with Innovay's assertion that the allegations in [plaintiff's] complaint establish the potential for coverage for "humiliation." ... Innovay's "offense" was fraud and the injury resulting from that offense was embarrassment or emotional harm. Fraud is not a covered offense under the Policy. [Plaintiff] did not allege that [the insured] engaged in any humiliating conduct regarding [him].

*Id.* at *5.[7]

Similarly, in *Houston Petroleum Co. v. Highlands Insurance Co.,* 830 S.W.2d 153

---

7. We find the California cases cited here to be particularly persuasive because California law, like Oklahoma law, looks beyond the mere causes of action asserted to determine whether the duty to defend has been trig-

(Tex.Ct.App.1990), the insured sought a defense under the "discrimination or humiliation" clause of its policy in a suit alleging damage to the plaintiff's "personal and business reputation and standing in the community." *Id.* at 156–57. The court rejected this bid for coverage and stated, "[t]he complaint simply alleges, however, that [the insured] made extravagant and fraudulent promises regarding the questioned investment, and made untrue statements regarding the soundness and profitability of the business. There are no allegations that the defendant discriminated against or humiliated the plaintiffs." *Id.* We agree with both of these courts and the court in *American Motorists Insurance Co. v. Allied–Sysco Food Servs., Inc.,* 19 Cal.App.4th 1342, 24 Cal. Rptr.2d 106 (1993), when it held that the term "humiliation" "covers character and reputation torts which may have at their cores humiliating conduct, and it does not provide indemnification for humiliation damages from whatever source they may flow." *Id.* at 112; *see also Liggett Grp., Inc. v. Ace Prop. and Cas. Ins. Co.,* 798 A.2d 1024, 1032 (Del.2002) (finding that a term in an insurance contract "must be read with the preceding list of torts encompassing, broadly, libel, slander, and defamation. It cannot be read as an independent extension of coverage to all mental anguish allegations in products liability, or negligence, actions.").

Thus, for coverage to exist for "personal and advertising injury" based on an offense of humiliation, the gravamen of the third-party suit must be humiliating conduct, as opposed to negligence. In this case, Dr. Balfour was sued for allegedly negligent conduct and not an offense of "humiliation." To conclude otherwise, would be contrary to the plain and natural reading of that word in context and expand

the scope of coverage to a degree not contemplated by the parties.

Finally, we address Dr. Balfour's contention that "it is improper for a court to distinguish between Balfour's alleged negligence and Saul's sexual battery." Aplt. Br. 32. Dr. Balfour relies upon the Oklahoma Supreme Court's decision in *Phillips v. Estate of Greenfield* for the proposition that "[c]overage does not turn on the legal theory under which liability is asserted, but on the cause of the injury." 859 P.2d 1101, 1105 (Okla.1993) (quoting *Farmers Ins. Grp. v. Nelsen,* 78 Or.App. 213, 715 P.2d 492, 494 (1986)). In *Phillips* (and similar cases cited by *Phillips* ), the parents of a driver were sued for negligent entrustment and negligent supervision after their son took the family motorcycle without permission and ended up in an accident that killed him and injured his passenger. The parents sought coverage under their insurance policy but their insurer refused to defend or indemnify based on the policy's motor vehicle exclusion. Despite the fact that the parents were being sued for negligence and not their own motor vehicle-related conduct, the court denied coverage and stated, "the claim of negligent supervision is intertwined with or intimately connected with the ownership or use of the motor vehicle." *Phillips,* 859 P.2d at 1106. With this authority in hand, Dr. Balfour argues that her "alleged negligence is so intertwined with Saul's humiliating acts of sexual assault, that they both must be encompassed as offenses of 'humiliation' under the Hanover policy." Aplt. Br. 34. We disagree.

Dr. Balfour's reliance on *Phillips* is misplaced. The underlying rationale in *Phillips* and the related cases is that "coverage under the policy depends on the scope of risk against which the insurer agrees to

gered. *See Gray v. Zurich,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168, 176–77 (1966).

provide indemnity." *Phillips,* 859 P.2d at 1105. With that as our focal point, it is easy to see why the Oklahoma Supreme Court refused coverage for a motorcycle accident when the policy excluded coverage for injuries arising out of the use of a motor vehicle; accidents causing injury resulting from the use of a motor vehicle were not within the scope of the risk insured. *See id.; see also Farmers Alliance Mut. Ins. Co. v. Willingham,* No. 08–CV–0532–CVE–FHM, 2009 WL 3429768 (N.D.Okla. Oct. 20, 2009) (no coverage under a policy with a sexual molestation exclusion where the third-party suit is based on a sexual molestation). Our inquiry in this case, then, is whether a rape by a non-employee third party (albeit a third-party who is connected to the insured) is within the scope of risk insured by the "discrimination or humiliation" clause of the policy. We think not. The relationship between Dr. Balfour's alleged negligence and the sexual assault of A.A. is more attenuated in this case than the relationship between the negligent entrustment of a motorcycle and an accident caused by the motorcycle. This attenuation is demonstrated by the fact that Saul sexually assaulted A.A. at a number of other locations, not just the DKBC clinic. What's more, none of the other "offenses" included in the "personal and advertising injury" provision are "offenses" that relate to bodily harm—torts such as battery and assault are conspicuously absent. As the court stated in *Phillips,* expanding coverage to cover this type of conduct "would expand the policy terms beyond those stated and agreed upon by the contracting parties." *Phillips,* 859 P.2d at 1106. The district court correctly held that Hanover has no duty to defend or indemnify Dr. Balfour as to the negligence claims asserted in Briner lawsuit.

AFFIRMED.

LUCERO, J., concurring in part and dissenting in part.

I agree with much of the majority opinion. I concur in its conclusion that the NCMIC policy does not provide coverage for the Briner suit. (Majority Op. 529–32.) And, with respect to the Hanover policy, I agree that A.A.'s injuries arose out of Dr. Balfour's business. (*Id.* at 534–36.) But I must part ways with the majority opinion as to its holding that the Hanover policy does not apply because "Dr. Balfour was sued for allegedly negligent conduct and not an offense of 'humiliation.'" (*Id.* at 538.)

As the majority opinion notes, the parties cite cases from other jurisdictions reaching divergent results under circumstances similar to those presented by this case. (*Id.* at 537.) The majority opinion discusses several such cases that focus on the nature of the claim asserted in the complaint against which the insured seeks defense by her insurance company. (*See id.* at 537–38.) I conclude that whatever merits such an approach may have, it is inconsistent with Oklahoma law.

In *Phillips v. Estate of Greenfield,* 859 P.2d 1101 (Okla.1993), the Oklahoma Supreme Court adopted an Oregon court's holding that "[c]overage does not turn on the legal theory under which liability is asserted, but on the cause of the injury." *Id.* at 1105 (quoting *Farmers Ins. Grp. v. Nelsen,* 78 Or.App. 213, 715 P.2d 492, 494 (1986)). That rule dovetails neatly with the specific language of the Hanover policy at issue in this case. That policy does not define coverage based on specific categories of claims, but applies to "any 'suit' seeking ... damages" for " 'bodily injury', 'property damage', or 'personal and advertising injury.'" Accordingly, under Oklahoma law and the specific language of the policy, it is immaterial whether Briner's complaint asserted a claim of humiliation.

As *Phillips* directs, determining the scope of coverage turns on the type of underlying injury rather than the legal theory of liability.

This approach is consistent with other Oklahoma insurance cases. In *Farmers Alliance Mutual Insurance Co. v. Willingham*, No. 08–CV–0532–CVE–FHM, 2009 WL 3429768 (N.D.Okla. Oct. 20, 2009) (unpublished), the court considered a similar claim of negligent entrustment resulting in a sexual assault. Citing *Phillips*, the court determined that there was no coverage under the relevant homeowners' insurance policy because that policy specifically excluded liability for sexual molestation. *Id.* at *4–5. As *Phillips* instructs, the *Willingham* court focused on whether the policy covered the cause of injury (sexual molestation), rather than on the theory of liability advanced. *Id.; see also Pierce v. Okla. Prop. & Cas. Ins. Co.*, 901 P.2d 819, 823–24 (Okla.1995) (using similar reasoning, based on *Phillips*, to conclude that a named driver exclusion precluded coverage for a negligent entrustment claim).

The *Phillips* approach is also consonant with that taken by courts in other jurisdictions. In *McFarlin v. Conseco Services, LLC*, 99–AR–2282–S & 02–AR–287–S, 2004 WL 6067338 (N.D.Ala. Feb. 25, 2004) (unpublished), the court considered policy language materially identical to that contained in the Hanover policy. *Id.* at *6. It rejected the insurer's argument that the policy did not apply because "the complaint does not specifically make a claim for humiliation." *Id.* The court explained:

> [T]he failure to allege one of the torts listed in the "personal injury" provision does not relieve Nationwide of its duty to defend. Admittedly, the use of the word "offenses" creates an ambiguity in the policies. However, such ambiguities are resolved against the insurer and in favor of the insured. Further, adopting Nationwide's reading of the insurance policies would render the "humiliation" language irrelevant or meaningless because no independent tort of humiliation exists in Alabama, which is the applicable law of the underlying tort claims.

*Id.* at *8 (citation omitted).

This reasoning applies with equal force here. As in *McFarlin*, Oklahoma law requires that "a policy of insurance is to be construed strictly against the insurer and in favor of the insured." *Spears v. Shelter Mut. Ins. Co.*, 73 P.3d 865, 868 (Okla.2003). And although the word "offense" can mean "a 'transgression of the law,'" it is also defined as a 'violation or breaking of a social or moral rule' and 'something that offends or displeases.'" *Paylor v. First Mountain Mortg. Corp.*, No. 278076, 2008 WL 4605304, at *6 (Mich.Ct.App. Oct. 9, 2008) (unpublished) (quoting *Random House Webster's College Dictionary* (1997)). Further, like Alabama, Oklahoma apparently does not recognize an independent tort of humiliation. Accordingly, the majority opinion's interpretation would impermissibly render "humiliation" coverage a nullity. *See Rodgers v. Tecumseh Bank*, 756 P.2d 1223, 1225 (Okla.1988) ("[A]n interpretation making a provision a useful and valid part of an agreement is preferred over a construction making the clause a nullity.").

Properly focusing on the nature of the injury, several courts have concluded "humiliation" coverage extends to a wide variety of claims. *See Smith v. St. Paul Guardian Ins. Co.*, 622 F.Supp. 867, 873 (W.D.Ark.1985) (holding that "injuries sustained by the alienation of affections" are "capable of reasonable categorization as 'humiliation'"); *Paylor*, 2008 WL 4605304, at *6 (holding that negligent training and supervision that resulted in humiliation was covered by materially identical policy language); *SL Indus. v. Am. Motorists*

*Ins. Co.,* 128 N.J. 188, 607 A.2d 1266, 1271, 1276 (1992) (common law fraud claim that alleged plaintiff "suffered from humiliation clearly falls within the policy's explicit coverage for 'injury arising out of ... humiliation'"); *see also Titan Holdings Syndicate, Inc. v. City of Keene,* 898 F.2d 265, 271 n. 6 (1st Cir.1990) (noting in dicta that the inclusion of "humiliation" in the definition of "personal injury" would "seem to expand the scope of coverage for personal injury to include claims against the insured based upon the *type* of injury suffered, rather than just claims for injuries arising from specifically enumerated *offenses*").

Applying this rule to the case at bar, I am convinced that the Hanover policy requires defense of the Briner lawsuit. The policy provides coverage for "injury ... arising out of ... humiliation ... that results in injury to the feelings or reputation of a natural person." The Briner complaint alleges that A.A. suffered "mental pain" and "severe emotional distress" as a result of the sexual assault that Saul committed at Dr. Balfour's office. There can be no doubt that these injuries constitute humiliation as that word is normally used. The plainest reading of the terms of the policy therefore covers A.A.'s injury, the proper locus of our analysis under *Phillips.*

The majority opinion distinguishes *Phillips* by claiming that the relationship between Dr. Balfour's alleged negligence in allowing Saul access to the office and Saul's sexual assault on A.A. is more attenuated than the relationship in *Phillips* between negligent entrustment and injury. (Majority Op. 539.) The *Phillips* decision notes that a different outcome might have been warranted if the insured property "is only in some marginal way associated with the injurious event." 859 P.2d at 1106 n. 5. But I must respectfully disagree with the majority opinion's statement that the

degree of attenuation differs between this case and *Phillips.* Dr. Balfour's alleged negligence was entrusting access to her office to Saul, a known sexual predator. And the alleged negligence in *Phillips* was permitting an unlicensed minor access to motorcycle keys. *Id.* at 1103. Both cases involve allegations that the insured negligently allowed access to a means of causing the injury that occurred to a party who was likely to cause that injury. I see no difference in the degree of connection between the entrustment and underlying offense.

The majority opinion also notes that Saul assaulted A.A. in other locations. (Majority Op. 539.) But the specific assaults at issue in the Briner suit required access to Dr. Balfour's office: If Dr. Balfour had not given Saul access, Saul could not have assaulted A.A. there. That he could have assaulted A.A. in some other location, and did so at other times, does not attenuate the connection between Dr. Balfour's negligent entrustment and the injury alleged in Briner's complaint. Likewise, even if the minor in *Phillips* could have injured his passenger without access to his father's motorcycle—perhaps by obtaining access to a different vehicle—his father's negligence was nonetheless a cause of the passenger's actual injury.

Because I conclude that *Phillips* requires us to construe the Hanover policy as mandating defense of the Briner suit, I respectfully dissent from the majority opinion's conclusion to the contrary.

HARTZ, Circuit Judge, concurring and dissenting:

I am pleased to join Judge Kelly's opinion in resolving the claim against Hanover. But I respectfully dissent from the disposition of the claim against NCMIC. I would reverse the judgment in favor of NCMIC because a malpractice liability policy with

a duty-to-defend provision requires the insurer to defend a meritless claim that the insured had a professional duty to protect the plaintiff.

A doctor obtains a professional-liability policy to protect herself in case she is sued for professional malpractice. Her concern is not just with meritorious suits, for which she needs insurance protection to pay any judgment. She also is worried about non-meritorious, even frivolous, ones; although ultimately there will be no judgment against her, she could be out a good bit of money for the expense of defending herself. Therefore, she chooses a policy that also pays for the defense of suits claiming (correctly or incorrectly) that she engaged in professional malpractice.

Here, one of the doctor's patients has been grievously assaulted. It is not at all obvious why the doctor should be liable for the assault, but she is sued. The complaint is creative in coming up with the theory that she had a professional responsibility to protect her patient from the assault by warning the patient of danger from the assailant. To defend the complaint, she will surely argue that a doctor has no duty as a doctor to warn a patient about dangers from other persons. What if this is a very good argument? Such a good argument that almost any court would agree? In that event does the malpractice insurer have no duty to make that argument for her? Can the insurer simply go to court and obtain a declaratory judgment that because the claim has no legal merit, it is not really a malpractice claim and the insurer has no duty to defend? I would hope not. I would assume that the duty to defend, which undoubtedly encompasses the duty to defend against a malpractice claim that has no *factual* basis, also encompasses the duty to defend against a malpractice claim that has no *legal* basis. Rather than making the no-malpractice argument in a duty-to-defend suit *against* the doctor, the insurer should make that argument *for* the doctor in the patient's suit against the doctor.

My difference with the majority opinion boils down to one sentence on page 9 of the opinion. The majority writes: "NCMIC's duty to defend is triggered only if the *injuries alleged in the Breiner complaint were the result* of the provision of 'professional services.'" Op. at 530 (emphasis added). I would restate the rule as follows: "NCMIC's duty to defend is triggered only if *the Breiner complaint alleged that the injuries were the result* of the provision of 'professional services.'" In other words, I would say that NCMIC cannot escape the duty to defend just because, as a matter of law, Dr. Balfour had no *professional* duty to do what the complaint says she had a duty to do. Perhaps some jurisdiction would hold that a doctor has a duty to warn patients of a danger posed by someone known to the doctor. Or, more importantly, perhaps a plaintiff would sue a doctor on that malpractice theory. It should be the duty of the malpractice-insurance carrier to represent the doctor in such a suit.

The Oklahoma Supreme Court has declared that "the insurer's duty to defend its insured arises whenever the allegations in the complaint stated a cause of action that gives rise to the *possibility of a recovery* under the policy; there *need not be a probability of recovery.*" *First Bank of Turley v. Fid. & Deposit Ins. Co.*, 928 P.2d 298, 303 n. 14 (1996) (internal quotation marks omitted). Apparently, the court has not specifically addressed coverage of a claim that is *legally* meritless; but I see no reason why it would not follow the prevailing law on that issue. Section 15 of Tentative Draft No. 2 (revised), July 23, 2014, of the American Law Institute's Principles of the Law of Liability Insur-

ance (ALI Principles), recently approved by the Council and membership of the ALI, states:

> (1) An insurer that has issued a liability insurance policy that includes a duty to defend must defend any claim that is *based* in whole or in part *on* any set of alleged facts and *an associated legal theory* that, if proven, would be covered by the policy, *without regard to the merits of* those allegations or *that theory.*

(emphasis added). Comment a to that provision explains:

> *Duty to defendant is independent of the merits of the claim.* The insurer's duty to defend does not depend on the probability of the claimant's success in the claim. The weaker a potentially covered claim is on the merits, the more valuable the defense coverage is in relation to the indemnity coverage. This is a central rationale underlying the long-established liability insurance principle that the duty to defend is broader than the duty to indemnify or cover a claim. In almost every case in which an insured is named as a defendant in a lawsuit, the insured will need a lawyer to provide a defense—to investigate the plaintiff's factual assertions, to determine the credibility of the evidence, and to evaluate the legal theory on which the legal claim is based. Only in a subset of cases will payment of a judgment be required. In the absence of a defense from the insurer, the insured could be forced by a frivolous lawsuit either to pay an out-of-pocket settlement or to incur large legal bills to defend against the suit.

ALI Principles § 15 cmt. a.

The Reporters' Note to Section 15 provides case law support: The Kansas Supreme Court recently stated that under a duty-to-defend provision an insurer " 'is contractually obligated to defend even meritless suits that fall within coverage.' " *Miller v. Westport Ins. Corp.,* 288 Kan. 27, 200 P.3d 419, 423 (2009), *quoting* Robert H. Jerry, II & Douglas R. Richmond, Understanding Insurance Law Section § 111[a], at 826?27 (4th ed.2007). And more recently the New Jersey Supreme Court wrote: "Notably, the potential merit of the claim is immaterial: the duty to defend is not abrogated by the fact that the cause of action stated cannot be maintained against the insured either *in law* or in fact-in other words, because the cause is groundless, false or fraudulent." *Abouzaid v. Mansard Gardens Assocs., LLC,* 207 N.J. 67, 23 A.3d 338, 347 (2011) (emphasis added) (internal quotation marks omitted). It is worth quoting the explanation for this rule given by the Seventh Circuit:

> Any other rule would have the paradoxical effect that the less meritorious the' suit, the less protection a liability insurance policy would give the defendant.... The insured who has bought a liability policy that entitles him to defense as well as indemnification wants to be defended against claims of liability regardless of their merit. He doesn't want to be stuck with the lawyer's bill just because he wins and therefore doesn't need to look to the insurer for indemnification. If he wanted that he would just buy indemnification and not defense.

*Scottsdale Ins. Co. v. Subscription Plus, Inc.,* 299 F.3d 618, 622–23 (7th Cir.2002); *see also Sheets v. Brethren Mut. Ins. Co.,* 679 A.2d 540, 544–45 (Md.1996).

If a plaintiff sued Dr. Balfour in a standard tort claim for injuries suffered in a motor-vehicle collision while Dr. Balfour was driving her child from home to a Little League game, NCMIC could easily get a declaratory judgment that it had no duty to defend her under a malpractice policy. The legal theory of the suit against her would just be that she violated the common-law duty to exercise care in driving on the streets. In contrast, here the claim

is that Dr. Balfour's failure to warn Breiner was a violation of her duty as a doctor. The majority opinion makes a convincing case that there was no such professional duty. But NCMIC had as much an obligation to represent Dr. Balfour in making that argument as it would to represent her in establishing that she had never met Breiner. One is a legal defense; the other is a factual defense. NCMIC had the same duty to raise either defense. "[T]he obligation to defend arises anytime an action is filed against the insured in which the allegations of the third party would bring the claim, *if successful*, within coverage." Jerry & Richmond, *supra*, § 111[a], at 794 (5th ed.2012).

I would reverse the judgment in favor of NCMIC and remand for further proceedings.